# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM H. "CHIP" JONES, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 3:23-CV-00687 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| ZANDER GROUP HOLDINGS, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In this putative class action,[1] Plaintiff asserts claims against Defendants pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), and in the alternative, for breach of contract and unjust enrichment, "due to Defendants' malfeasance with regard to [Plaintiff's] rights under two deferred compensation plans governed by ERISA." (Doc. No. 43, "Second Amended Complaint," at ¶ 1).

Pending before the Court is a motion to dismiss (Doc. No. 48, "Motion") the Second Amended Complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, filed by Defendants, Zander Group Holdings, Inc., Zander Group Holdings, Inc. Employee Stock Ownership Plan, Zander Group Holdings, Inc. 401(k) Plan, Jeffrey J. Zander, JJZ Insurance Agency Partnership d/b/a Zander Insurance Group, Zander Insurance Agency, Joshua Vollet, Shervin Eftekhari, Elizabeth Collins, and Steven James (collectively "Defendants"). Defendants filed a memorandum in support of the Motion (Doc. No. 49, "Memorandum"), and

---

[1] Plaintiff's Motion for Class Certification (Doc. No. 69) is currently under review.

Plaintiff filed a response in opposition to the Motion (Doc. No. 52, "Response"), whereafter Defendants filed a reply in support of the Motion (Doc. No. 53, "Reply").[2]

For the reasons provided herein, the Motion will be **denied in part** and **granted in part.**

<u>FACTS AS ALLEGED IN THE COMPLAINT</u>[3]

A. The Stock Repurchase

Plaintiff was hired by the "Employer Entities"[4] in or around June 2010 as an IT manager. (Doc. No. 43 at ¶¶ 40-41). While Plaintiff was employed by the Employer Entities, the Employer

---

[2] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Second Amended Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph(s).

[3] The facts contained in this section come from Plaintiff's Second Amended Complaint (Doc. No. 43). In this section, the Court will sometimes paraphrase allegations that were made in Plaintiff's Second Amended Complaint and other times will directly quote Plaintiff's Second Amended Complaint. Where the Court is quoting Plaintiff's Second Amended Complaint, that fact is made clear by quotation marks or indented text. Moreover, where the quoted material from Plaintiff's Second Amended Complaint itself quotes a document or an individual, or otherwise uses quotation marks, that fact is made clear by quotation marks within the quote.

For purposes of the instant Motion and pursuant to the typical mechanisms of assessing facial attacks under Federal Rule of Civil Procedure 12(b)(1) and motions under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the facts alleged in the Second Amended Complaint. But the Court does not accept as true any legal conclusions (even if couched as facts). As for any representation in the Second Amended Complaint that the Court is *not* accepting as true, the Court generally identifies it by qualifying it (as, for example, by "Plaintiff alleges") to denote that it is not being taken as true but rather is set forth to indicate what Plaintiff *claims* to be true. Throughout this Order, except as indicated in the next sentence, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false. Having said that, at times when assessing whether Plaintiff has alleged factual matter sufficient to support her respective claims, the Court does point that it is basing its assessment on the facts alleged in the Second Amended Complaint; in that particular context, the Court does use the phrase "Plaintiff alleges" to precede the facts alleged, even though the Court is taking those facts as true for purposes of the Motion.

[4] The "Employer Entities," is used in the Second Amended Complaint to refer collectively to Zander Insurance Agency, Zander Group Holdings, Inc., and JJZ Insurance Agency Partnership d/b/a Zander Insurance Group. The Court elects to use the same (collective) term in the same manner, in part because any distinction between those entities has no bearing on the disposition of the Motion.

Entities implemented both a 401(k) plan ("401(k) Plan") and an employee stock ownership plan (the "Plan"). (*Id.* at ¶¶ 42-43). As a full-time employee of the Employer Entities, Plaintiff was eligible to—and did—participate in both the 401(k) Plan and the Plan. (*Id.* at ¶¶ 44-46). In October 2014, Plaintiff resigned from the Employer Entities. (*Id.* at ¶ 47). Following his separation from employment, Plaintiff remained a participant in both the Plan and the 401(k) Plan, but in 2016 he rolled his funds over from the 401(k) Plan to different investments. (*Id.* at ¶¶ 48-49). Under the Plan, "Plaintiff's awarded shares of Company stock were held in a trust account maintained by the [Plan] to be paid once Plaintiff reached an eligible age to draw these funds without penalty." (*Id.* at ¶ 51). For more than seven years, Plaintiff maintained his funds in the Plan without issue. (*Id.* at ¶ 53).

Beginning in or around November of 2021, the "Individual Defendants"[5] began the process of "push[ing] out all [Plan] members that were no longer employed by the Employer Entities, such as Plaintiff, from the [Plan] through a [Plan] stock repurchase" ("Stock Repurchase"). (*Id.* at ¶ 55). On November 12, 2021, Joshu Vollet ("Vollet") sent a letter (Doc. No. 1-4, "November Letter") to Plaintiff, which stated that Plaintiff had "30 days from the date of this notice to consider accepting this offer."[6] (Doc. No. 43 at ¶¶ 56-57). The November Letter "laid out two options for Plaintiff: 'If accepted [option 1], [Plaintiff] will get a 100% immediate payout of the vested balance to redeem all of [Plaintiff's] ESOP stock. If the offer is not accepted during the 30-day period [option 2], the

---

[5] "Individual Defendants" is used in the Second Amended Complaint to refer collectively to Jeffrey J. Zander, Joshu Vollet, Shervin Eftekhari, Elizabeth Collins, Steven James, and John Does 4-8. The Court elects to use the same (collective) term in the same manner, in part because any distinction between those individuals has no bearing on the disposition of the Motion.

[6] The emphasis here was not in the letter itself but rather was added in paragraph 57 of the Second Amended Complaint.

offer will terminate.'"[7] (*Id.* at ¶ 58 (quoting the November Letter)). The November Letter "did not include any instructions for non-acceptance of th[e] 'offer.'" (*Id.* at ¶ 61). Having decided that he did not want to accept the offer, Plaintiff did not respond to the November Letter. (*Id.* at ¶ 62-63). Enclosed with the November Letter were other documents, which contained terms different from those presented in the November Letter. (*Id.* at ¶ 65). But "[r]elying on the plain and unambiguous information and instructions in [the November L]etter, Plaintiff did not review the enclosed documents, as [the November L]etter indicated [that the enclosed] forms were only necessary in the event the recipient intended to accept the 'offer.'" (*Id.* at ¶ 66).

On December 13, 2021, Vollet sent Plaintiff an email (Doc. No. 1-5, "December Email") noting that "Plaintiff had not returned the paperwork from the enclosure indicating his preferences for the stock repurchase." (Doc. No. 43 at ¶ 70). That same day Plaintiff responded to the December Email stating, "I'm not selling. I'm keeping the funds with you guys." (*Id.* at ¶ 72). On December 16, 2021, Vollet sent the following response:

> Thank you for your inquiry. Pursuant to the ZANDER GROUP HOLDINGS, INC. Employee Stock Ownership Plan documents and the applicable Internal Revenue Service rules and regulations, Zander Group Holdings, Inc., in consultation with the Trustee for the ESOP and the ESOP's Third Party Administrator, has elected to provide the following options to terminated ESOP participants: 1) all cash buy out; 2) transfer to a qualified retirement account; or 3) transfer into the ZANDER GROUP HOLDINGS, INC. 401(k) Plan. Remaining a participant in the ESOP is not an option. Please let me know as soon as possible which option you are electing. If we do not hear back from you, the default option is a transfer of your vested balance to the ZANDER GROUP HOLDINGS, INC. 401(k) Plan.

(*Id.* at ¶ 73).

---

[7] The emphasis here was not in the letter itself but rather was added in paragraph 58 of the Second Amended Complaint.

Plaintiff's attorney wrote[8] to Vollet and David Lewis,[9] "reiterating that Plaintiff did not want to sell his ESOP stock and demanding a copy of the ESOP 'Plan document including all amendments and any documents regarding the reshuffling procedures.'" (*Id.* at ¶ 74 (quoting Docket No. 1-6)). As of the filing of the Second Amended Complaint, Plaintiff had not received any document that reflected Vollet's statement that "'[t]he Zander Group Holdings Board of Directors ha[d] approved an ESOP stock repurchase for terminated ESOP participants.'" (*Id.* at ¶ 75 (quoting November Letter)).

On January 14, 2022, Plaintiff received a "Transaction Confirmation" dated January 1, 2022, "indicating that on December 31, 2021, $781,879.76 had been transferred or rolled over to the 401(k) Plan." (*Id.* at ¶ 76). Notably, "a number of currently unknown but ascertainable [Plan] participants . . . had their accounts transferred to the Zander 401(k) along with Plaintiff's on December 31, 2021"—the date of the Stock Repurchase. (*Id.* at ¶ 92). Plaintiff alleges that "the Administrator [of the Plan] was not authorized to roll over Plaintiff's funds under the terms of the Plan," because "Plaintiff never submitted a writing to the Administrator of the [Plan] that he had elected to distribute or rollover his funds." (*Id.* at ¶ 84).

B.  Relevant Plan Language

Article XI of the Plan addresses "Distributions Following Settlement Date"[10] (Doc. No. 1-2 at 26). Section 11.03 is titled "Reinvestment of ESOP Stock Account" and states the following:

---

[8] Exhibit F to the original Complaint—which the Court treats as Exhibit F to the Second Amended Complaint, as explained in a footnote below—makes clear what the text of the Second Amended Complaint does not: that this writing took the form of a letter (rather than, for example, an email). This letter is on the docket at Docket No. 1-6 and is quoted in paragraph 74 of the Second Amended Complaint.

[9] Lewis was "the Employer Entities' Chief Legal Officer." (Doc. No. 43 at ¶ 73).

[10] The Plan defined "Settlement Date"—a date that would vary for each participant in the Plan—as the latest of four dates: the date (if any) of a normal retirement for the participant, the date (if any) of a disability retirement for the participant, the date (if any) of the participant's death, and the date (if any) of the

In any year that a Participant who has terminated employment with the Employers (an "Inactive Participant") has shares of Company Stock in his or her ESOP Stock Account, the Administrator shall exchange any cash or other liquid assets held in the ESOP Cash Accounts of Participants who are actively employed by the Employers (an "Active Participant") for the shares of Company Stock held in the Inactive Participant's ESOP Stock Account, at an exchange rate determined based on the most recent fair market value of Company Stock, as determined in accordance with Section 7.08. Such exchange shall be made pro rata based on the Active Participants' ESOP Cash Account balances. In the event that there is not sufficient cash or other liquid assets in the Active Participants' ESOP Cash Accounts to exchange for all of the shares of Company Stock in the Inactive Participants' ESOP Stock Accounts, the exchange shall be pro rata based upon the Inactive Participants' ESOP Stock Accounts. The purpose of this exchange is to assure that the Accounts of Active Participants are invested in Company Stock, to the maximum extent possible within the assets available to the Trust, and to assure that the Accounts of Inactive Participants are invested in assets other than Company Stock, to the maximum extent possible within the assets available to the Trust.

(Doc. No. 1-2 at 27). Section 11.04 of the Plan addresses how a participant's account balance shall

be distributed and states in relevant part as follows:

Timing of Distributions. Distribution of the balance of a Participant's Accounts shall be made as follows, subject to the provisions of this Article XI:

(a) Distribution of Accounts - General Rule. Except as otherwise provided in this Section 11.04, distribution of a Participant's Accounts shall commence as follows:

    (i)    if a Participant's Settlement Date is due to Normal Retirement, Disability Retirement or death (as described in Sections 9.01(a), (b) and (c), respectively), distribution of the Participant's Accounts shall commence not later than one year after the end of the Plan Year in which the Participant's Settlement Date occurs;

    (ii)    if a Participant's Settlement Date is due to Resignation or Dismissal (as described in Section 9.01(d)), distribution of the Participant's Accounts shall commence not later than one year after the end of the Plan Year which is the fifth Plan Year following the Plan Year in which the Participant's Settlement Date occurs.

---

participant's resignation or dismissal. (*See* Doc. No. 1-2 at 19-20). In the present case, the "Settlement Date" was the date of Plaintiff's resignation (the only one of those dates applicable to Plaintiff's situation).

> . . .

> (c) Participant Consent. Notwithstanding any other provision of this Article XI, if a Participant's vested Account balances total more than $1,000, no portion of his or her Account may be distributed to such individual before such individual's attains Normal Retirement Age without the individual's written consent. Failure to provide such consent within 30 days following solicitation of such consent by the Administrator shall defer the Participant's right to receive a distribution until the Participant's attainment of Normal Retirement Age (or death, if earlier).

(*Id.* at 28). Finally, Section 11.05 addresses "Direct Rollovers," and states in relevant part as follows:

> Certain individuals who are to receive distributions under the Plan may elect that such distributions be paid in the form of a direct rollover (as described in Code section 401(a)(31)

> . . .

> > (e) Elections. An Eligible Distributee's election of a direct rollover pursuant to this Section 11.05 must be in writing on a form designated by the Administrator and must be filed with the Administrator at such time and in such manner as the Administrator shall determine. The Administrator shall establish such rules and procedures as it deems necessary to provide for distributions by means of direct rollover.

 (*Id.* at 29-30).

    C.  Procedural Background

On July 12, 2023, Plaintiff filed the original complaint (Doc. No. 1) to initiate the instant action. Thereafter, Defendants filed a motion to dismiss (Doc. No. 18), which was mooted by the filing of Plaintiff's first amended complaint (Doc. No. 29). Thereafter, Defendants filed another motion to dismiss (Doc. No. 34), which was again mooted, this time by the filing of the Second Amended Complaint. Presently before the Court is Defendants' Motion (Doc. No. 48), wherein

Defendants seek dismissal of "Plaintiff's Second Amended Complaint in its entirety pursuant Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)." (Doc. No. 48 at 1).

<u>LEGAL STANDARD</u>

To begin with, it is important to note under which legal standard (and indeed under which Federal Rule) the Court will be adjudicating the respective challenges brought by Defendants. Defendants bring their Motion pursuant to both Rule 12(b)(1) and Rule 12(b)(6). Because standing is "an issue of the court's subject matter jurisdiction" the Court will analyze Defendants' challenge to standing under the standard of review of a 12(b)(1) motion. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *see also Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) ("Standing goes to [a c]ourt's subject matter jurisdiction" (citations omitted) (internal quotation marks omitted)). Likewise, because Defendants' challenge to Plaintiff's state law claims (Counts VI and VII) ("Plaintiff's State Law Claims") is premised on Defendants' assertion that the Court lacks jurisdiction[11] over Plaintiff's State Law Claims, the Court will analyze Defendants' challenge to Plaintiff's State Law Claims under the standard of review of a 12(b)(1) motion. The remainder of Defendants' challenges are properly analyzed under the standard of review for a 12(b)(6) motion.

**A.      Standard for Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)**

"[T]he existence of subject matter jurisdiction may be raised at any time, by any party, or even *sua sponte* by the court itself." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) (quoting *In re Lewis*, 398 F.3d 735, 739 (6th Cir. 2005)). Defendants' jurisdictional challenges to Plaintiff's standing and to Plaintiff's State Law Claims call into question the existence of subject-matter jurisdiction in this case.

---

[11] Defendants first argued preemption as grounds for dismissing Plaintiff's State Law Claims, but following Plaintiff's Response—wherein Plaintiff clarified that the state law claims are "alternative claims in the event the Court determines ERISA does not apply" (Doc. No. 52 at 25)—Defendants shifted the argument from preemption to lack of subject jurisdiction. (Doc. No. 53 at 5).

"There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks." *Accord v. Anderson Cnty. Tenn.*, No. 3:21-CV-00077, 2021 U.S. Dist. LEXIS 247347, 2021 WL 6135691, at *2 (M.D. Tenn. Dec. 28, 2021) (citing *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). The applicable legal standard depends on the type of attack:

> A facial attack challenges merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. If those allegations establish cognizable federal subject-matter jurisdiction, jurisdiction exists. A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist.

*Transamerica Life Ins. Co. & Transamerica Corp. v. Douglas*, No. 3:21-CV-00194, 2023 U.S. Dist. LEXIS 51463, 2023 WL 2656527, at *4 (M.D. Tenn. Mar. 27, 2023) (quoting *Bush v. Reliant Bank*, No. 3:21-CV-00525, 2022 U.S. Dist. LEXIS 115853, 2022 WL 2359635, at *3 (M.D. Tenn. June 30, 2022), *aff'd*, No. 22-5656, 2023 U.S. App. LEXIS 8560, 2023 WL 5275025 (6th Cir. Apr. 10, 2023)). "Courts reviewing factual attacks have 'wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts.'" *Id.* (quoting *Doe v. Lee*, No. 3:21-cv-00809, 2022 U.S. Dist. LEXIS 71576, 2022 WL 1164228, at *4 (M.D. Tenn. Apr. 19, 2022) (citing *Gentek*, 491 F.3d at 330) (footnote omitted)). "And '[a]s always, the party invoking federal jurisdiction has the burden to prove that jurisdiction.'" *Transamerica*, 2023 U.S. Dist. LEXIS 51463, 2023 WL 2656527 at *4 (quoting *Doe*, 2022 U.S. Dist. LEXIS 71576, 2022 WL 1164228, at *4 (citations omitted)).

Like any kind of challenge to subject-matter jurisdiction, a challenge specifically to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *See Kale v.*

*Procollect, Inc.*, 547 F. Supp. 3d 793, 796 (W.D. Tenn. 2021) ("Challenges to standing can be facial or factual." (citation omitted)); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack.").

Here, both the challenge to standing and the jurisdictional challenge to Plaintiff's State Law Claims present facial challenges.[12] A review of Defendants' standing arguments, (Doc. No. 49 at 6-10; Doc. No. 43 at 1), reveals that Defendants bring a facial challenge rather than a factual challenge. Notably, Defendants argues that "Plaintiff cannot demonstrate the second requirement [of standing]—a causal connection between any alleged harm and the complained of conduct." (Doc. No. 49 at 6). Similarly, Defendants' challenge to Plaintiff's State Law Claims is facial rather than factual, inasmuch as Defendants assert that "the Court lacks jurisdiction over the state law claims." (Doc. No. 53 at 5). Therefore, in assessing Defendants' standing challenge and the jurisdictional challenge to Plaintiff's State Law Claims, the Court will consider only the sufficiency of the Complaint and will "accept the allegations set forth in the Complaint as true." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x. 576, 579 (6th Cir. 2014).

**B.      Standard for Motions to Dismiss Under Fed. R. Civ. P 12(b)(6)**

The remainder of Defendants' arguments are properly considered under Rule 12(b)(6). For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[12] Defendants ask the Court to consider its November letter sent to Plaintiff (Doc. No. 18-2) when analyzing the standing challenge (Doc. No. 49 at 8 n.3). The Court declines to do so, finding that the November letter does affect the standing analysis. (*Infra* Section I).

liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter —plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity

to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *Accord Herpst v. Parkridge Med. Ctr., Inc.*, No. E201700419COAR3CV, 2018 WL 4052208, at *3 (Tenn. Ct. App. Aug. 23, 2018); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).[13]

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552

---

[13] The Court concludes that it may consider the Plan document (Doc. No. 1-2) in analyzing the Motion. Importantly, Plaintiff attached the Plan document—as well as other exhibits ("Exhibits")—to his initial complaint (Doc. No. 1). Although Plaintiff did not re-attach the Exhibits to either of the amended versions of the complaint, Plaintiff continued to reference the Exhibits as if he had. Moreover, the Plan document was also central to his claims therein, as Plaintiff's arguments generally relate to the manner in which the Plan document was or was not carried out. Therefore, the contents of Plan document may be considered; more precisely, the Court can consider what the Plan document *says* (to the extent that the bare fact of what it says is relevant).

Although the Court could conduct a similar analysis to decide whether to consider the other Exhibits, the Court perceives no need to rely on the other Exhibits in analyzing the Motion.

F.3d 430, 433 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

<u>DISCUSSION</u>

## I. Standing

As a preliminary matter, the Court must determine whether Plaintiff has Article III standing. "The standing inquiry is not a merits inquiry." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021). So, "the fact that a plaintiff might lose on the merits does not deprive the plaintiff of standing to sue." *Bowles v. Sabree*, 121 F.4th 539, 552 (6th Cir. 2024) (citation omitted). *Accord Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 679 (6th Cir. 2022) ("[S]tanding is a threshold jurisdictional issue that serves a gatekeeping function before the merits." (citations omitted)). Therefore, "[f]or standing purposes, we accept as valid the merits of [plaintiff's] legal claims." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022). *Accord Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."); *Kentucky v. Yellen*, 54 F.4th 325, 349 n. 16 (6th Cir. 2022).

"The requisite elements of Article III standing are well established: A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Ted Cruz for Senate*, 596 U.S. at 296 (citing *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560-561 (1992)). Presently, Defendants appear to dispute neither that Plaintiff has suffered an injury in fact (i.e., the first requirement of standing)

nor that the injury is likely to be redressed by a favorable decision (i.e., the third requirement of standing). Instead, Defendants argue that Plaintiff cannot demonstrate a causal connection between the challenged conduct of Defendants and the harm suffered (i.e., the second requirement of standing). (Doc. No. 49 at 6).

"A defendant's actions must have a 'causal connection' to the plaintiff's injury." *Gerber*, 14 F.4th at 505 (citing *Lujan*, 504 U.S. at 560). "While there must exist a causal connection between the plaintiff's injury and the defendant's conduct, traceability is not the same thing as proximate causation." *In re AME Church Emp. Ret. Fund Litig.*, No. 1:22-MD-03035-STA-JAY, 2024 U.S. Dist. LEXIS 34302, 2024 WL 844943, at *7 (W.D. Tenn. Feb. 28, 2024) (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing. . . ."). Notably, "The standard for establishing traceability for standing purposes is *less demanding* than the standard for proving tort causation. At the pleading stage, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (internal citations and quotations omitted). "Still, there are cases when a plaintiff will fail to meet the traceability standard, such as when an injury is 'so completely due to the [plaintiff's] own fault as to break the causal chain.'" *Id.* (quoting *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989)). For example, the traceability requirement cannot be met when the alleged injury is one that was "self-inflicted" by the plaintiff, because "a self-inflicted injury, by definition, is not traceable to anyone but the plaintiff." *Id.*

In the present case, the complained-of conduct was Defendants' act of converting Plaintiff's ESOP account to cash and transferring the proceeds to Plaintiff's 401(k) Plan via the Stock Repurchase (the "Complained-of Conduct") (Doc. No. 49 at 6; Doc. No. 43 at ¶ 140),

resulting in Plaintiff's injury: "a significant decrease in value of Plaintiff's benefit accruals" ("Plaintiff's Injury") (Doc. No. 43 at ¶ 140). Defendants argue that Plaintiff cannot demonstrate a causal connection between Plaintiff's Injury and the Complained-of Conduct, asserting that any harm was self-inflicted and "entirely of [Plaintiff's] own making." (Doc. No. 49 at 6-7).[14] The Court disagrees.

Defendants' argument is flawed because it relies on an overly broad notion of "self-inflicted injury." Importantly, the Court discerns a vital difference between an injury that is merely *purposefully incurred* by a plaintiff, compared to an injury that is truly "self-inflicted" by a plaintiff. That is, it is one thing to inflict an injury on oneself, and it is quite another to incur an injury inflicted by someone else, and the distinction holds even if the injury inflicted by the other person was incurred purposefully. The Supreme Court addressed this distinction in *Ted Cruz for Senate*, making clear that it has never "recognize[d] an exception to Article III standing's traceability for injuries that a party purposely incurs." 596 U.S. at 290 (2022). To the contrary, the Supreme Court in *Ted Cruz for Senate* "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application*, even if the injury could be described in some sense as willingly incurred*." *Id.* at 297 (emphasis added) (finding the injury to be fairly traceable to defendants even when the plaintiffs chose to subject themselves to the statutes that caused them injury and that they are presently challenging). *Accord Yellen*, 54 F.4th at 345-46. The Sixth Circuit has since applied the holding from *Ted Cruz for Senate*, finding (in a case involving a challenge to a particular statute) that even if a plaintiff

---

[14] Although Defendants could have attempted in other ways to challenge Plaintiff's ability to establish a causal connection, Defendants did not do so and instead relied solely on their assertion that "Plaintiff's harm [was] entirely of his own making" (Doc. No. 49 at 9) when challenging the causal connection requirement of standing. Therefore, the Court—when analyzing whether Plaintiff established a sufficient causal connection between the Plaintiff's Injury and the Complained-of Conduct—likewise will cabin its analysis to whether the alleged injury was self-inflicted.

voluntarily subjected themselves to the challenged statute, such voluntary act "would not defeat (*and, indeed, would establish*) [the plaintiff's] standing to challenge [the statute at issue]." *Yellen*, 54 F.4th at 346. It follows that merely voluntarily subjecting oneself to behavior or threatened behavior that results in injury similarly would not defeat one's standing to challenge the behavior but instead would establish a plaintiff's standing to challenge it.

Unlike injury that is merely purposefully incurred, injury that is wholly manufactured by a plaintiff is not fairly traceable to a defendant as such would qualify as injury that is "self-inflicted." In *Ted Cruz for Senate*, the Supreme Court reconciled its holding therein with its prior case law, explaining that *Ted Cruz for Senate* is consistent with its prior holdings in *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398 (2013) and *Pennsylvania* v. *New Jersey*, 426 U.S. 660 (1976). In so doing, the Court in *Ted Cruz for Senate* emphasized that the plaintiffs in both *Clapper* and *Pennsylvania* took some affirmative voluntary action that created plaintiffs' injury,[15] whereas the injury to the plaintiff in *Ted Cruz for Senate* was caused directly by threatened action on the part of the defendant rather than by affirmative action taken by the plaintiff. *Ted Cruz for Senate*, 596 U.S. at 297.

From the aforementioned Supreme Court and Sixth Circuit precedent, this Court distills the rule down to the following: when a plaintiff's own affirmative conduct creates the injury—and such conduct does not represent an attempt to prevent impending harm[16]—the injury is self-

---

[15] More specifically, in *Ted Cruz for Senate* the Supreme Court explained that the plaintiffs in *Clapper* "attempted to *manufacture* standing by *voluntarily taking* costly and burdensome measures," to protect themselves from hypothetical future harm. *Ted Cruz for Senate*, 596 U.S. at 297 (emphasis added) (citing *Clapper*, 567 U.S. at 402). Similarly, the injury suffered by the plaintiffs in *Pennsylvania* was due to the "*unilateral decisions* by [plaintiffs] to reimburse their residents for taxes," in other words it "was due to their own *independent response* to taxes levied on others." *Id.* (emphasis added) (citing *Pennsylvania*, 426 U.S. at 664).

[16] The Court does not mean to imply that *all* harm that results from a plaintiff's affirmative conduct is categorically self-inflicted. To the contrary, the Supreme Court's holding appears to suggest that even when a plaintiff's own affirmative conduct causes the harm, if the act was taken in an attempt to prevent impending injury, then the harm that results would not qualify as self-inflicted harm. *See Ted Cruz for Senate*, 596 U.S. at 297 ("In *Clapper* v. *Amnesty Int'l USA* … for example, the plaintiffs attempted to

inflicted and therefore untraceable to the defendant. However, when the harm is a result of some action on the part of a defendant—like applying (or threatening to apply) an unlawful (i.e., unconstitutional) statute or engaging or threatening to engage in wrongful behavior—such harm can appropriately be traced to the defendant, even where a plaintiff intentionally or knowingly subjected itself to such harm. Applying these principles to the present case, the Court finds that Plaintiff's Injury was not self-inflicted, but instead (at most) merely willingly incurred. As a result, the Court rejects Defendants' argument that Plaintiff's Injury is self-inflicted and for that reason is not traceable to Defendants.

Seeking to avoid this result, Defendants argue in the Memorandum that Plaintiff's Injury was entirely of Plaintiff's own making. In support of this argument, Defendants point out that in December 2021—before the occurrence of the Complained-of Conduct (i.e., the Stock Repurchase)—Defendants sent Plaintiff multiple emails requesting his preference for the disbursement of his funds; those emails informed Plaintiff that keeping the funds in his ESOP account was not an option and indicated that the default option was to transfer the funds to Plaintiff's 401(k) account. (Doc. No. 49 at 9). Defendants invoke the aforementioned facts—which are fair game for invocation on this facial challenge because Plaintiff alleged them in his Second Amended Complaint (Doc. No. 43 at ¶¶ 70-73)—to argue that Plaintiff's Injury was self-inflicted because Plaintiff "chose not to take action that could have avoided the injury." (*Id.*).

---

manufacture standing by voluntarily taking costly and burdensome measures that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge…. Their problem, however, was that they *could not show that they had been or were likely to be subjected to that policy in any event*." (Emphasis added) (internal citations and quotations omitted)). However, because Plaintiff's harm was not caused by any affirmative act on the part of Plaintiff, the Court finds it unnecessary to delve into such nuances.

This argument founders because generally "choosing not to take action" does not amount to taking action, and as noted above the plaintiff must take action to cause an injury on himself in order for the injury to be self-inflicted. As the Court clarified above, even when a plaintiff knowingly and willingly subjects itself to injury—rather than choosing to take action in an attempt to prevent said harm—that does not mean that any resulting harm is self-inflicted so as to defeat Plaintiff's standing to challenge the Complained-of Conduct.[17] Therefore, accepting the aforementioned factual allegations as true, such does not establish that Plaintiff's Injury was self-inflicted but instead establishes that it was merely willingly incurred, meaning, Plaintiff's Injury is still properly traceable to Defendants sufficient to fulfill the second requirement of Article III standing.

Accordingly, the Motion will be denied as to Defendant's request therein to dismiss this case for (a purported) lack of standing pursuant to Rule 12(b)(1).

## II.    Failure to State a Claim

### A.    Lack of Notice, 29 U.S.C. § 1054(h) (Count I)

ERISA Section 204(h) (the "Notice Provision") states in relevant part, "An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2)." 29

---

[17] The Court wishes to clarify that a contrary holding—finding instead that Plaintiff's Injury was self-inflicted because Plaintiff chose not to take action that could have avoided injury—would run afoul of standing jurisprudence. *Cf. Ted Cruz for Senate*, 596 U.S. at 298. Demanding that Plaintiff comply with Defendants' email notice wherein Defendants requested that Plaintiff told Defendants how they should disburse his funds while Plaintiff actively contested the sufficiency of such notice and the appropriateness of any such disbursement would have required Plaintiff to willingly subject himself to the wrongful conduct that he challenges. As the Supreme Court noted, "[s]uch a principle finds no support in our standing jurisprudence." *Ted Cruz for Senate*, 596 U.S. at 298.

U.S.C. § 1054(h)(l).[18] Count I of Plaintiff's Second Amended Complaint asserts a claim for violation of ERISA Section 204(h) based on an alleged lack of notice allegedly required under Section 204(h). (Doc. No. 49 at 10-13). Defendants make three primary (and alternative) arguments as to why Count I must be dismissed: (1) the Notice Provision does not apply to the Plan, because the Plan is not "[a]n applicable pension plan" within the meaning of (i.e., for purposes of) the Notice Provision (Doc. No. 49 at 10-11); (2) the Notice Provision (even if applicable to the Plan) did not obligate Defendants to provide notice to Plaintiff "because transferring the balance of his ESOP account into the 401(k) Plan did not reduce the rate of any future benefit accrual" (Doc. No. 49 at 12-13. *Accord* Doc. No. 53 at 2); and (3) Plaintiff improperly seeks monetary rather than appropriate equitable relief (Doc. No. 49 at 13; Doc. No. 53 at 3). Ultimately, the Court agrees with Defendants' first argument for dismissal of Count I, finding that ERISA Section 204(h) is inapplicable to the Plan because the Plan is not "an applicable pension plan" within the meaning of the Notice Provision. Furthermore, the Court agrees with Defendants that the inapplicability of ERISA Section 204(h) is fatal to Count I and thus serves as grounds (by itself) for dismissal of Count I, meaning that the Court need not and will not analyze Defendants' (alternative) second and third arguments for dismissal.

The applicability to the Plan of the Notice Provision turns on whether (as Plaintiff claims but Defendants dispute) the Plan qualifies as "an applicable pension plan" for purposes of the Notice Provision. The Court answers that question in the negative, concluding that the Plan does not qualify as an applicable pension plan.

---

[18] When referring to the Notice Provision, the Court will refer interchangeably to "ERISA Section 204(h)," which is the numbering/lettering in the Employee Retirement Income Act of 1974 of the subsection comprising the Notice Provision, and "29 U.S.C. § 1054(h)," which is where ERISA Section 204(h) is codified.

The parties agree (and it is self-evident) that the Notice Provision applies only in the case of contemplated change to "[a]n applicable pension plan." 29 U.S.C. § 1054(h)(1). An "applicable pension plan," for purposes of the Notice Provision, is defined to include only the following two categories of plans: "(i) any defined benefit plan; or (ii) an individual account plan which is subject to the funding standards of section 412 of the Internal Revenue Code of 1986 [26 USCS § 412]." 29 U.S.C. § 1054(h)(8)(B).[19] The parties agree that the Plan in question does not fall into the first category of plans. (Doc. 49 at 11 ("An ESOP is not a 'defined benefit plan.'"); Doc. No. 52 at 11 ("First, 29 U.S.C. § 1054(h)(8)(B) defines 'applicable pension plan' as any defined benefit plan, which the [Plan] is not.")). But the parties do dispute whether the Plan falls into the second category of plans.

For a plan to fall into the second category, two things must be true: (1) the plan must be "an individual account plan" and (2) the plan must be "subject to the funding standards of" 26 U.S.C. § 412. *See* 29 U.S.C. § 1054(h)(8)(B). Because there appears no dispute that the Plan is an individual account plan[20] (i.e., the first requirement) the Court will focus its analysis on whether the Plan is subject to the funding standards of 26 U.S.C. § 412, which sets forth "[m]inimum funding standards" (i.e., the second requirement). 26 U.S.C. § 412.

The question is a matter of statutory interpretation. As explained by the Sixth Circuit:

> The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear. However, this

---

[19] The "funding standards of section 412 of the Internal Revenue Code" to which 29 U.S.C. § 1054(h)(8)(B) refers are called "*minimum* funding standards" in section 412. 26 U.S.C. § 412 (emphasis added).

[20] The Court finds that Defendants have admitted that the Plan is an individual account plan. Defendants stated in their Motion that "an ESOP is an 'individual account plan.'" (Doc. No. 11 at 11). Moreover, Defendants' position is that the Plan is an ESOP, (Doc. No. 49 at 2 ("The Plan is an employee stock ownership plan.")). So it logically follows that under Defendants' view, the Plan is an individual account plan. And Plaintiff shares that view. Therefore, the Court treats the Plan as qualifying as an individual account plan.

court also looks to the language and design of the statute as a whole in interpreting the plain meaning of statutory language

*United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013) (quoting *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) (internal quotation marks and citations omitted)). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *United States v. Edwards*, 783 F. App'x. 540, 544 (6th Cir. 2019) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993) (internal quotation marks and citations omitted)). Importantly, when interpreting a statute, it is inappropriate for Courts to read in words and/or requirements that are not there. *Cf. Lamie v. Unites States Tr.*, 540 U.S. 526, 538 (2004) (finding petitioner's interpretation to "stumble[] . . . in the face of another canon of interpretation" because Petitioner's interpretation would require the Court to "read an absent word into the statute."). The separation of powers forbids courts from rewriting statutes, instead requiring courts to interpret statutes as written. *Cf. Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) ("[W]e are not at liberty to rewrite the statute passed by Congress and signed by the President.").

Section 412 explicitly states that the "minimum funding standards" imposed by section 412 "shall ***not*** apply to . . . any profit-sharing or ***stock bonus plan***." 26 U.S.C. § 412(e)(2)(A) (emphasis added). Importantly an ESOP is a type of "stock bonus plan."[21] 29 U.S.C. § 1107(d)(6)(A) ("The term 'employee stock ownership plan' means an individual account plan . . . which is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan both of which are

---

[21] Outside of asserting that the Plan is an ESOP (a particular type of stock bonus plan), Defendants did not assert that the Plan would qualify as some other form of "profit-sharing or stock bonus plan" within the meaning of 26 U.S.C. § 412(e)(2)(A), so as to remove the Plan from the minimum funding standards of section 412. Therefore, because Defendants have the burden of explanation, the Court will not *sua sponte* venture into whether the Plan would qualify as some other form of profit-sharing or stock bonus plan exempt from the minimum funding standards of section 412. Instead, in analyzing whether 26 U.S.C. § 412(e)(2)(A) exempts the Plan from the minimum funding standards of section 412, the Court will focus solely on whether the Plan qualifies as an ESOP.

qualified.").[22] The term ESOP is defined as "an individual account plan . . . which is a stock bonus plan which is **qualified . . . under section 401 of the Internal Revenue Code of 1986** [26 USCS § 401]."[23] *Id.* (emphasis added).[24] For a plan to be qualified under section 401 of the Internal Revenue Code, the plan must meet the requirements[25] of subsections (h) and (o) of 26 U.S.C. §409. 26 U.S.C. § 401(23) ("A stock bonus plan shall not be treated as meeting the requirements of this section unless such plan meets the requirements of subsections (h) and (o) of section 409 [26 USCS § 409]"). The parties specifically dispute whether the Plan meets the distribution-and-payment-provision requirements of 26 U.S.C. § 409(o). A plan meets those requirements if:[26]

---

[22] Consistent with the footnote immediately below, it worth noting that the "which" here actually should be "that."

[23] The Court notes that the statute should have used the word "that" where it used "which." The Court says this not to be a grammatical scold, but rather because (a) there absolutely is a real distinction between "that" and "which," as those terms are properly used; (b) the distinction actually matters here; and (c) as between those two distinction terms, "that" is plainly the one intended here. Without delving into why the observation is accurate (beyond giving the hint that as properly used, "that" introduces a restrictive phrase and "which" introduces a non-restrictive phrase) the Court observes that the word "that," unlike the word "which," makes clear that only a *subset* of individual account plans qualify as an ESOP—namely, an *individual account plan that is* stock bonus plan that is qualified under section 401 of the Internal Revenue Code.

[24] Notably, when arguing whether the Plan does or does not qualify as an ESOP, the parties focus solely on whether the Plan is "qualified . . . under section 401 of the Internal Revenue Code of 1986 [26 USCS § 401]," 29 U.S.C. § 1107(d)(6)(A), and forgo any analysis as to whether the Plan qualifies as "an individual account plan . . . which is a stock bonus plan." *Id.* The Court will likewise cabin its analysis to whether the Plan is qualified under section 401 and will accept (as the parties seemed to have) that the Plan is "an individual account plan . . . which is a stock bonus plan."

[25] The Court herein refers to the "requirements" of § 409(o) or to what § 409(o) "requires." That terminology is not meant to suggest that 409(o)'s "requirements" must be satisfied for a plan to *comply with the law*; rather, 409(o)'s "requirements" are requirements for a plan to *be qualified under section 401 of the Internal Revenue Code*. Notably, as an alternative to speaking in terms of whether a plan meets the requirements of § 409(o), Plaintiff at times speaks in terms of whether a plan is "in compliance" with § 409(o); each of these two forms of terminology are referring to the same thing.

[26] The Court appreciates that in addition to meeting the requirements of 26 U.S.C. § 409(o), there are other characteristics a plan must possess to qualify as an ESOP. But because the parties only dispute whether the requirements of 26 U.S.C. § 409(o) are met, the Court will solely analyze the fulfillment of such requirement.

[t]he plan provides that, if the participant . . . elects, the distribution of the participant's account balance in the plan will commence not later than 1 year after the close of the plan year—(i) in which the participant separates from service by reason of the attainment of normal retirement age under the plan, disability, or death, or (ii) which is the 5th plan year following the plan year in which the participant otherwise separates from service[.]

26 U.S.C. § 409(o)(1)(A).[27] Plaintiff focuses on the phrase "if the participant . . . elects"[28] to argue that because the Plan distributed assets without his election, the Plan does not meet the requirements of 26 U.S.C. §409(o). (Doc. No. 52 at 12 ("the [Plan] is not in compliance with 26 U.S.C. § 409(o), because the [Plan] made a distribution, the rollover of Plaintiff's liquidated [Plan] account, that Plaintiff did not elect to receive.")). This argument is fatally flawed in two ways, each of which involves Plaintiff's misinterpretation of 26 U.S.C. § 409(o). Importantly, each flaw independently and alternatively warrants dismissal of Plaintiff's 29 U.S.C. § 1054(h) claim (Count I).

First, § 409(o) states in relevant part only that a plan meets its requirements by outlining how quickly a participant's account balance will be distributed "if the participant . . . elects . . . . " 26 U.S.C. § 409(o)(1)(A). That subsection does not say that a distribution may be made—or that

---

[27] The Court opts not to dwell on why it reaches this conclusion and why it matters (which it does, at least for anyone who wishes to try to understand this somewhat oddly drafted statutory provision), but the Court concludes that this provision should be read as if there was a comma before "elects." The omission of that comma is but one of several flaws (not all of which are mentioned herein but all of which are surmountable in any event, thankfully) in the punctuating or other aspects of the statutory language with which the Court wrestles herein.

[28] The phrase at issue here—"if the participant . . . elects"—begs the question: If the participant elects *what*? To receive a *distribution*? To receive a distribution *specifically within the time frames* outlined in § 409(o)(1)(A)(i)-(ii)? Something else? The statutory language is not clear on this point. Plaintiff seems to assert that the reference is simply to electing *a distribution* (and not to electing a distribution of a particular nature or timing), and the Court is inclined to agree, even while noting that ultimately it is immaterial to resolving the issue presented here; irrespective of the nature of the "elect[ion]" to which § 409(o)(1)(A) refers, what matters is that § 409(o) has nothing to say about what may or must (or cannot) happen—or what a plan, to meet § 409(o)'s requirements, must say about what may or must (or cannot) happen if no such "elect[ion]" is made. Herein, the Court speaks either in terms of an "elect[ion]" without reference to what is elected or in terms of an "elect[ion]" to receive a distribution

a plan meets § 409(o)'s requirements only if the plan provides that a distribution may be made—"*only* if the participant . . . elects"; indeed, § 409(o) says nothing about circumstances where the participant does *not* elect; that is, it says nothing about what may or must happen—or what a Plan, in order to meet § 409(o)'s requirements, must provide about what may or must happen—when the participant makes no election. Therefore, although by its terms § 409(o) requires a plan to outline how quickly a distribution must occur *if* an election occurs, it does *not* prohibit a distribution in the absence of an election and does not require a plan (in order to meet § 409(o)'s requirements) to prohibit a distribution in the absence of an election. In other words, § 409(o) requires that a plan state that a participant electing to receive a distribution of his or her account balance will begin receiving the requested distribution within a specified period, but it has nothing to say about what may, may not, or must happen[29]—or what a plan must provide regarding what may, may not, or must happen in order to meet § 409(o)'s requirements—in the *absence* of an election. Although other provisions of ERISA and/or a particular plan conceivably could make a participant's election of a distribution a prerequisite to distribution, *§ 409(o) in particular* does not do so and likewise does not require a plan (in order to meet § 409(o)'s requirements) to make a participant's election of a distribution a prerequisite to distribution.

So, the Court finds that a plan, in order to meet the requirements of § 409(o), needs merely to outline how quickly a distribution of a participant's account balance must occur if the participant elects. A plan still can meet § 409(o)'s requirements even if it does not outline what happens in the absence of an election.

---

[29] The Court indicates in more detail below why it says that section 409(o), as properly construed, has nothing to say at all about what may, may not, or must happen in the case of a particular participant (and this applies not just to what may, may not, or must happen *in the absence of an election by a particular participant*).

In the present case, the Plan does appear to meet the requirements of § 409(o) as the Court interprets them. In relevant part, the Plan states the following:

> (a) Distribution of Accounts - General Rule. Except as otherwise provided in this Section 11.04, distribution of a Participant's Accounts shall commence as follows:
>
> > (i) if a Participant's Settlement Date is due to Normal Retirement, Disability Retirement or death (as described in Sections 9.01(a), (b) and (c), respectively), distribution of the Participant's Accounts shall commence not later than one year after the end of the Plan Year in which the Participant's Settlement Date occurs; and
> >
> > (ii) if a Participant's Settlement Date is due to Resignation or Dismissal (as described in Section 9.01(d)), distribution of the Participant's Accounts shall commence not later than one year after the end of the Plan Year which is the fifth Plan Year following the Plan Year in which the Participant's Settlement Date occurs.

(Doc. No. 1-2 at 28) (emphasis added). This language directly mirrors the language of § 409(o), except that it does not contain the conditional language from § 409(o): "if the participant . . . elects." But the language accounts for the condition, because it applies whether or not the participant elects; this means that it applies "if the participant . . . elects." In other words, the Plan is drafted so as to provide that participants necessarily will receive distributions of their account balances within the timeframe outlined in § 409(o), if the participant elects a distribution (and also, for that matter, if the participant does *not* elect a distribution). Not even Plaintiff disputes that the Plan includes the language that section 409(o) requires (*See* Doc. No. 52 at 12-13 (arguing not that the terms of the Plan do not include the language that § 409(o)'s requires, but rather that "Defendant's *actions* are out of line with the terms of the [Plan]."); *id.* at 7 ("Plaintiff takes no umbrage with the drafting of the ESOP, which does generally mirror ERISA's required language;

the problem is Defendants' lack of compliance with these requirements.")).[30] Unsurprisingly, Defendants agree. (Doc. No. 49 at 12 ("The Plan plainly meets [§ 409(o)'s] requirement[s].").

In sum, the first reason that Plaintiff's argument—that the Plan does not meet the requirements of §409(o) because Plan assets were distributed without his election—is flawed is that it requires the Court to read in the word "only" before the phrase "if the participant elects" in § 409(o). Lacking as it does the word "only," the language here in no way indicates that a plan, to meet § 409(o)'s requirements, must prohibit distributions in the absence of election; still less does the language here prohibit distributions from actually being made in the absence of an election. Instead, the language merely states that to meet § 409(o)'s requirements, a plan must specify alternative *deadlines* for beginning a distribution *if there is an election*. The Plan does so.

And nothing about Plaintiff's individual circumstances can change that fact. Indeed, § 409(o) simply does not address the circumstances underlying Plaintiff's claim of lack of notice— the situation (Plaintiff's situation) where no election was made—and therefore Plaintiff's situation could not have somehow converted a clear satisfaction of the requirements of § 409(o) into a failure to meet § 409(o)'s requirements. Therefore, the Court finds that Plaintiff's argument is fatally flawed for this reason alone and that the Plan does meet the requirements of 26 U.S.C. §409(o).[31]

---

[30] Although admitting that the Plan includes the language that section 409(o) requires, Plaintiff nevertheless argues that the Plan does not meet 409(o)'s requirements—on the theory that (supposedly) what happened in Plaintiff's case was not consistent with what is contemplated by section 409(o) even though its required language was included in the Plan. The Court addresses that argument below.

[31] Notably, Defendants appear to concede that—consistent with Plaintiff's view—that 409(o) requires that a plan provide for election before distribution. In the Court's view, this concession is entirely unwarranted, and the opposite of what was conceded is in fact true—a reality that on its own is a reason to dismiss this claim. But since Defendants for whatever reason did not assert this reason, one might ask whether the Court can rely *sua sponte* on this reason. The Court believes that it can, considering the reason that Defendants *did* assert as grounds for dismissal of this claim—essentially that because this claim fails if the requirements of section 409(o) are satisfied, because those requirements *are* satisfied based on information that can be considered on a Rule 12(b)(6) motion, and because they do not somehow become *unsatisfied* based on what *actually ends up happening* regarding distribution (given that section 409(o) is concerned solely with what *the plan says* (about certain matters pertaining to distribution) and not about what *actually ends up*

That takes the Court to the second and alternative reason ("Alternative Reason") for rejecting Plaintiff's argument that the Plan does not meet the requirements of § 409(o). The Alternative Reason is that Plaintiff's argument is based on the flawed premise that even when a plan (based on its language) otherwise meets the requirements of § 409(o), the plan somehow ceases to meet the requirements of § 409(o) in the case of a particular participant because that participant's own situation was handled in a manner contrary to what is contemplated by § 409(o) (and by plans that meet the requirements of § 409(o), such as that participant's plan).

The Court actually has alluded to the Alternative Reason several times above, in noting that the requirements of § 409(o) (a) concern only what *a plan must say* about (the timing of the beginning of) a distribution—and *not* what must, may or cannot *actually happen* regarding a distribution to a particular participant; and (b) cannot go in the case of a particular participant from

---

*happening* regarding distribution). This reason is one based on statutory construction; Defendant has squarely raised the argument that under the proper construction of the statute as applied to the facts assumed to be true on the instant Motion, the claim fails. In the Court's view, once Defendants has raised this kind of argument, the Court in adjudicating the Motion can consider any issues (including ones not raised by Defendants) it sees fit in determining whether the statute as properly construed supports this claim; having properly accepted the task to interpret the statute, the Court cannot ignore an aspect of its ultimate construction of the statute that reveals a statutory basis for dismissing the claim. This view was well stated by one district court when addressing a claim under the Real Estate Settlement Procedures Act:

> First, plaintiffs argue that this Court improperly dismissed their RESPA § 2605 claim *sua sponte.* Specifically, plaintiffs contend that the Court acted *sua sponte* because its analysis of the statute depended, in part, on the construction of the term "action with respect to the inquiry of the borrower," when defendants' motion to dismiss did not focus on that term. However, plaintiffs misconstrue the notion of a court acting *sua sponte.* A court does not act *sue sponte* when it independently engages in analysis or proposes arguments on issues raised in the motion before it. In this case, defendants argued that plaintiffs had failed to state a claim because defendants had complied with RESPA § 2605. This is precisely the ground on which we dismissed plaintiffs' claim. The fact that we thought it necessary to examine certain statutory terms in greater depth than defendants changes only the focus of the analysis, not the nature of the defense. Clearly, a court's decision is not limited by the precise contours of a party's argument.

*Cardiello v. The Money Store*, No. 00 CIV. 7332 (NRB), 2001 WL 1020311, at *1 (S.D.N.Y. Aug. 24, 2001).

being *satisfied*, based on the language of the plan at issue, to somehow being *unsatisfied* based on what happened in the case of that particular participant.

The Alternative Reason is grounded largely in the reality that it is one thing for a statute to require a plan to say certain things, and it is quite another for a statute to require, allow, or prohibit certain things from actually happening. And § 409(o) plainly is a statute that requires a plan to say certain things (about distributions, and in particular the timing of the beginning of distributions, to an electing participant), and not a statute that addresses what must, may, or may not *actually happen* regarding distributions to participants. As further explained below, this reality is independently fatal to Plaintiff's argument.

For purposes of explaining the Alternative Reason, the Court assumes *arguendo* (in Plaintiff's favor, and contrary to the Court's conclusion above) that § 409(o) requires a plan to provide that a plan participant must elect prior to any distribution being made—i.e., requires a plan to prohibit a distribution unless the participant has elected a distribution. But even assuming that § 409(o) requires a plan to *provide* for election before distribution, that is all that it does: require that the plan provide for this, i.e., be *written or drafted* (or "*designed*") in such manner as to provide for this. As Defendants correctly argue, § 409(o) says nothing about what happens if a plan is not carried out as designed and further "does not suggest that failure to comply with the provisions of a plan so designed would strip the plan of its tax qualifications and transform it into some other type of plan." (Doc. No. 53 at 2).

Turning to the language of § 409(o), Defendants focus their argument on the use of the phrase "provides that," arguing that use of the phrase "provides that" indicates that a plan meets the requirements of 26 U.S.C. § 409(o)—and is therefore "qualified"—if "it is *designed* as described" in 26 U.S.C. § 409(o). (Doc. No. 53 at 2). But Plaintiff asserts that a plan must not only

be designed as described, but also be applied as described in 26 U.S.C. § 409(o); he focuses his argument on the use of the word "elects," asserting that although the Plan was designed as described in 26 U.S.C. § 409(o), "because the [Plan] made a distribution . . . that Plaintiff did not elect to receive . . . [that the Plan] is not in compliance with 26 U.S.C § 409(o)." (Doc. No. 52 at 12). Put another way, the parties dispute whether the statutory language requires that—to meet the requirements of 26 U.S.C. § 409(o)—the Plan must only be designed in the manner outlined in 26 U.S.C. § 409(o) or instead be both designed *and applied* in the manner outlined in 26 U.S.C. § 409(o).

In the present case, the parties do not dispute that the Plan *as drafted* meets the requirements of 26 U.S.C. § 409(o)—as they interpret them (i.e, § 409(o)'s requirements). (Doc. No. 49 at 12 ("The Plan plainly meets [§ 409(o)'s] requirement[s]."; Doc. No. 52 at 12-13 (arguing not that the terms of the Plan are noncompliant with § 409(o)'s requirements, but rather that "Defendant's *actions* are out of line with the terms of the [Plan]."); *id.* at 7 ("Plaintiff takes no umbrage with the drafting of the ESOP, which does generally mirror ERISA's required language; the problem is Defendants' lack of compliance with these requirements."")).[32] Instead, the parties dispute whether that is enough to say the Plan "meets the requirements" of 26 U.S.C. §409(o). Plaintiff construes § 409(o) to mean that a plan meets § 409(o)'s requirements only if the plan is both designed and applied in the manner outlined § 409(o). On the other hand, Defendants interpret that subsection to mean that a plan meets § 409(o)'s requirements if the plan is designed in the

---

[32] Because the parties do not dispute that the Plan as *drafted* complies with the requirements of 26 U.S.C. § 409(o) the Court will accept the parties' representations that the Plan is drafted in a manner that complies with the requirements outlined in 26 U.S.C. § 409(o)—as they interpret § 409(o)'s requirements. The Court will focus its analysis on whether that is enough to be deemed in compliance with 26 U.S.C. § 409(o).

manner outlined, irrespective of whether it is actually applied in that manner. As should be clear by now, the Court interprets the language in the same manner as Defendants.

The relevant statutory provision is as follows: "A plan meets the requirements of [409(o)'s distribution and payment requirements] if. . . [t]he plan provides that, if the participant . . . elects, the distribution of the participant's account balance [will commence as described]." 26 U.S.C. § 409(o). This provision can be broken down into three parts: (1) "The plan"[33] (2) "provides that" (3) only[34] if the participant elects, the participant's account balance will be distributed as described. As Defendants point out, of consequence in interpreting the statutory language is the meaning of the phrase "provides that."

Generally, when a noun is followed by the phrase "provides that," what logically follows is a list of rules, traits, terms, etc. that the noun contains. For example, when discussing contracts, it is common to say "the contract provides that . . ." followed by a list terms or rules that the contract contains. In that sentence, it is generally understood that the phrase "provides that" is synonymous for the phrase "states that" or "says that." That general understanding applies here in the Court's view. Because "the plan" (a noun) is followed by the phrase "provides that," it logically follows that what comes thereafter is a list of things the plan contains. Put another way, the relevant provision can be interpreted as follows: "the plan [states/says] that, if the participant elects, the distribution of the participant's account balance in the plan will commence [as described]." In

---

[33] Depending on the context, "plan" conceivably could be used to refer to the written document that lays out the terms of the plan or more generally to the operation (or the operators) of the plan. But in context, the Court discerns that the reference must be to the written document and not the broader notion of the operation of the plan.

[34] As discussed above, although the Court does not ultimately interpret § 409(o) as the parties seem to, the Court will—for purposes of conducting this Alternative Analysis—assume *arguendo* that § 409(o) requires a plan to *provide* for election before distribution.

context the Court interprets the statutory provision as stating that a plan complies with § 409(o) if the plan is designed/drafted to include the requirements outlined in § 409(o).

Further, the same interpretation results from relying on the plain meaning of the word "provides." As emphasized above, when a word is not defined by statute, courts normally construe it in accord with its ordinary or natural meaning. The plain meaning of the word "provide"—and by extension "provides"—is "to have as a condition: STIPULATE." *Provides*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/provide. Utilizing the plain meaning of the word "provides," the provision reads that a plan meets § 409(o)'s requirements if "the plan [has as a condition] that, if the participant elects, the distribution of the participant's account balance in the plan will commence [as described]." Utilizing the plain meaning, the Court finds that it is logical to interpret the statutory language in the same manner Defendants have: merely requiring the plan in question "to *have* as a condition" those listed requirements. Put another way, the plan must merely state the listed requirements to meet § 409(o)'s requirements.

The Court finds issue with Plaintiff's interpretation, as such reading would require the Court to re-write the statute by virtue of reading in requirements that are not there. Plaintiff focuses his time and attention on the word "elects," but wholly ignores the preceding phrase: "provides that." The phrase "[t]he plan provides that," does not implicitly suggest anything about how the plan in question is ultimately carried out; rather, the use of the phrase "provides that" focuses the inquiry on whether the plan contains certain conditions not whether those conditions are ultimately met. Meaning, the focus is not on whether Plaintiff actually elected to receive a distribution prior to such, but instead on whether the plan stated as a condition that Plaintiff would have to so elect for distribution prior to such occurring. Plaintiff's requested interpretation would require the Court

not to simply interpret the statutory language, but rather would require the Court to wholly write in the phrase "results in." The court cannot and will not write in such requirement.

A closer examination of the statutory structure reinforces the Court's interpretation. For example, as laid out above, for a plan to qualify as an ESOP it must be "qualified" under 26 U.S.C. § 401, which requires that the plan meet the requirements not only of 26 U.S.C. 409(o)—the provision the Court is presently interpreting—but also of 26 U.S.C. § 409(h). *See* 29 U.S.C. § 1107(d)(6)(A); *see also* 26 U.S.C. § 401(23). Plaintiff does not dispute that the Plan meets the requirements of § 409(h), and so the Court need not analyze whether the Plan meets such requirements. But an analysis of the structure of § 409 reinforces the Court's interpretation of § 409(o). Section 409(h) states:

> A plan meets the requirements of [§ 409(h)] if a participant who is entitled to a distribution from the plan—:
>
> > **(A)** *has a right* to demand that his benefits be distributed in the form of employer securities, and
> > **(B)** if the employer securities are not readily tradable on an established market, *has a right to* require that the employer repurchase employer securities under a fair valuation formula.

26 U.S.C. § 409(h) (emphasis added). The focus here is on what rights the plan in question affords the participant rather than if the plan is carried out in a manner that complies with the plan's stated terms. Put another way, as drafted, § 409(h) appears to indicate that a plan meets the subsection's requirements so long as the plan in question affords the participant a right to make certain demands. Therefore, § 409(h) clearly focuses on how the plan in question is designed, rather than focusing on how the plan is ultimately carried out or applied as it relates to the specific participant. The Court interprets § 409(o) in a similar manner, construing the subsection as focusing not on how the plan in question is carried out, but instead focusing on whether the plan is designed in accordance with the requirements of the subsection.

Further, such interpretation makes sense in light of the tax ramifications that come with classifying (or not classifying) a plan as an ESOP. If a plan is deemed an ESOP—meaning "an individual account plan . . . which is a stock bonus plan which is *qualified . . . under* 26 USC § 401," 29 U.S.C. § 1107(d)(6)(A) (emphasis added)—then the plan is "exempt from taxation." 26 U.S.C. §501(a). Therefore, a plan qualifying as an ESOP affords a tax benefit to the beneficiary of the plan, so it would not logically follow that an employer's failure to abide by the terms of the plan—which as drafted would suffice to qualify the plan as an ESOP deserving of tax-exempt status—should result in the stripping of the beneficiary's tax benefits. Therefore, there is justifiable reason that Congress would have drafted the requirements of § 409(o) to focus on the design of the plan in question rather than the manner in which such plan was carried out.

Moreover, Congress knows how to write, and indeed *has written*, statutory language concerning what must, may or cannot *actually happen* regarding a distribution to a particular participant. But Congress did not write *any* such language into Section 409(o), and that is dispositive here.

Finally, the Court's interpretation makes sense also in light of an individual's ability to bring suit for violation of the terms of a plan pursuant to ERISA Section 502(a) (29 U.S.C § 1132(a)).[35] Importantly, just because a plan was not applied in accordance with its terms, that does not mean the terms are not a part of the plan. To the contrary, it is the mere fact that a plan includes such provisions that then affords an individual the ability to bring a claim for violation of such provisions. It would be illogical to say that a plan is not an ESOP because the provisions of "the plan"—those provisions which qualify a plan as an ESOP—were not applied as designed, but then

---

[35] The Court will refer interchangeably to "29 U.S.C. § 1332" and "ERISA Section 502," which is the number of the section in the Employee Retirement Income Act of 1974 that was codified at 29 U.S.C. § 1332.

afford a beneficiary the opportunity to sue for violation of such provisions.[36] Rather, the proper

solution would be for the plan in question to retain its identity as an ESOP and allow the beneficiary

to simply sue for violation of the terms of the ESOP.

In sum, the Court finds alternatively for the Alternative Reason that Plaintiff's argument is

without merit and that the Plan qualifies as an ESOP under 26 U.S.C. § 401 because (irrespective

of how the Plan is carried out) the Plan meets the requirements of § 409(o).

Because the Plan is an ESOP, the Plan is *not* an "applicable pension plan" subject to the

Notice Provision. And because the Plan is not subject to the Notice Provision, Plaintiff cannot state

a plausible claim for relief against Defendants under the Notice Provision. Accordingly,

Defendants' Motion thus will be granted as to Count I of Plaintiff's Second Amended Complaint,

and Count I therefore will be dismissed.

### B.      Breach of Fiduciary Duty (Count II)[37]

Defendants make two alternative arguments for dismissal of Plaintiff's claim for breach of

fiduciary duty (Count II) ("Fiduciary Duty Claim"). First, Defendants assert that "Plaintiff cannot

bring a claim for benefits disguised as a fiduciary breach claim to avoid administrative

exhaustion," and that "[e]ven if Plaintiff had brought his claim as one seeking benefits, however,

he failed to exhaust administrative remedies as [the Sixth] Circuit requires." (Doc. No. 49 at 14-

---

[36] For purposes of illustration and to demonstrate the inherent contradiction with saying a plan would lose its ESOP status if certain provisions are not complied with, the Court poses the following question: if (as Plaintiff claims) a plan loses its ESOP status due to non-compliance with the terms of the plan that made the plan an ESOP in the first place, what happens if a beneficiary were to file suit for violation of the terms of the plan and be awarded relief whereby the company was required to apply the plan in a manner consistent with the terms thereof? Would the plan then miraculously convert back to an ESOP? Under Plaintiff's interpretation, the answer would have to be yes; this would be an odd result, one that further illustrates the flawed nature of Plaintiff's interpretation.

[37] The Court uses this caption because Count II portrays itself as a claim for breach of fiduciary duty. As discussed below, however, the Court finds this portrayal inaccurate.

15). Second, and alternatively, Defendants assert that even if the Court found that Plaintiff's Fiduciary Duty Claim was indeed a claim for breach of fiduciary duty—as opposed to a claim for benefits—the Fiduciary Duty Claim nonetheless should be dismissed because (a) "Plaintiff has not pled with sufficient specificity any actions taken by the Defendants in a fiduciary capacity," (*id.* at 15) and (b) Plaintiff has not "plausibly alleged [that] any Defendant committed a fiduciary breach," (*id.* at 20). Agreeing with Defendants' first argument, the Court will dismiss Plaintiff's Fiduciary Duty Claim.

Plaintiff attempts to bring this Fiduciary Duty Claim pursuant to 29 U.S.C. § 1132(a)(3).[38] (Doc. No. 43 at ¶ 156). In relevant part, 29 U.S.C. § 1132 (i.e., ERISA Section 502) provides:

(a) Persons empowered to bring a civil action. A civil action may be brought—

(1) by a participant or beneficiary—

. . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

. . .

---

[38] Notably, "[c]laims for breach of fiduciary duty can be brought by the ERISA plan as a whole under 29 U.S.C. § 1132(a)(2), or by an individual beneficiary under 29 U.S.C. § 1132(a)(3)." *Fernandez v. Semmes-Murphey Clinic, P.C.*, No. 2:18-CV-2048-MSN-DKV, 2020 WL 3485340, at *3 (W.D. Tenn. Apr. 9, 2020). Plaintiff's Second Amended Complaint purports to indicate that the Fiduciary Duty Claim is brought pursuant to both § 1132(a)(2) and § 1332(a)(3). Notably, § 1332(a)(2) can be used to recover "any losses to the plan," but "1132(a)(2) bars [a plaintiff's] recovery for individual relief in the form of payment for the individual insurance policy and requires Plaintiff to allege injury with respect to the actual plan." *Walker v. Fed. Express Corp.*, 492 F. App'x 559, 562 (6th Cir. 2012). Although Plaintiff's Second Amended Complaint conclusively states that the Fiduciary Duty Claim is brought on behalf of the Plan, in reality—and as is evidenced by the relief sought via the Fiduciary Duty Claim—the Fiduciary Duty Claim is brought on behalf of individual Plan participants (including Plaintiff himself) in an attempt to recover on behalf of the Plan participants as opposed to the Plan itself. Therefore, the Court finds that the Fiduciary Duty Claim is not properly framed as a claim brought pursuant to § 1332(a)(2). So the Court will proceed as though Plaintiff was attempting to bring the Fiduciary Duty Claim solely pursuant to § 1132(a)(3). As it turns out, for reasons stated below, the Court ultimately finds that the Fiduciary Duty Claim is not properly brought pursuant to § 1132(a)(3), either.

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan. . . .

29 U.S.C. § 1132. Notably, Sixth Circuit caselaw is clear that "a plaintiff who has standing to pursue a claim for recovery of benefits under 29 U.S.C § 1132(a)(1)(B) cannot pursue a claim for equitable relief under § 1132(a)(3), which instead operates as a catchall for plaintiffs not otherwise provided for under § 1132." *Julia v. Bridgestone/Firestone, Inc.*, 101 F. App'x 27, 30 (6th Cir. 2004) (citing *Varity Corp. v. Howe,* 516 U.S. 489, 512 (1996); *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 615-16 (6th Cir. 1998)). "The Supreme Court clearly limited the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies. *Wilkins*, 150 F.3d at 615 (citing *Varity*, 516 U.S. at 512). More specifically, the Sixth Circuit has clarified that "the availability of relief under § 502(a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § 502(a)(1)(B)." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372-73 (6th Cir. 2015) (citing *Wilkins*, 150 F.3d at 615). "A claimant can pursue a breach-of-fiduciary-duty claim under § 502(a)(3), irrespective of the degree of success obtained on a claim for recovery of benefits under § 502(a)(1)(B), only where the breach of fiduciary duty claim is based on an *injury* separate and distinct from the denial of benefits or where the remedy afforded by Congress under § 502(a)(1)(B) is otherwise shown to be inadequate." *Id.* at 372 (citing *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 840-42 (6th Cir. 2007)). Thereafter, the Sixth Circuit clarified that the aforementioned language makes clear that "where an avenue of relief for the injury was available under § 1132(a)(1)(B), '*irrespective of the degree of success obtained*,' a breach-of-fiduciary-duty claim

cannot be brought." *Strang v. Ford Motor Co. Gen. Ret. Plan*, 693 F. App'x 400, 405 (6th Cir. 2017) (quoting *Rochow*, 780 F.3d at 372 (emphasis added)).[39]

"ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides a contract-based cause of action to participants and beneficiaries to recover benefits, enforce rights, or clarify rights to future benefits under the terms of an employee benefit plan." *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 560 (6th Cir. 2017) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998)). Because a plaintiff must "exhaust his or her administrative remedies prior to commencing suit in federal court' for a denial-of-benefits claim," *Reynolds v. Sec., Police & Fire Pros. of Am. & Participating Emps. Health & Welfare Benefit Plan*, No. 23-CV-13099, 2025 WL 582547, at *5 (E.D. Mich. Feb. 21, 2025) (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)),[40] plaintiffs are incentivized to disguise a denial-of-benefits claim (which requires administrative exhaustion prior to commencing suit) as a breach-of-fiduciary-duty claim (which does *not* require administrative exhaustion prior to commencing suit). Although administrative exhaustion is not required prior to bringing a claim for breach of fiduciary duty, a "[p]laintiff cannot get around the exhaustion requirement by simply disguising his [benefits] claim as a breach of fiduciary duty." *Weiner v. Klais & Co.*, 108 F.3d 86, 91 (6th Cir. 1997) (citing *Drinkwater v. Metropolitan Life Ins.,* 846 F.2d 821, 826 (1st Cir.1988) ("If we were to allow claimants to play this characterization game, then the exhaustion requirement would be rendered meaningless.")), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002).

---

[39] This is because "ERISA remedies are concerned with the adequacy of relief to redress the claimant's injury, not the nature of the defendant's wrongdoing." *Rochow*, 780 F.3d at 371.

[40] *Accord Hitchcock*, 851 F.3d at 560 ("Although the statute itself is 'silent as to whether exhaustion of administrative remedies is a prerequisite to bringing a civil action[,] . . . due to ERISA's provision for the administrative review of benefits,' the courts, including this Circuit, have read an exhaustion requirement into the statute." (quoting *Fallick*, 162 F.3d at 418)).

In the present case, the Court finds that Plaintiff cannot pursue a claim for equitable relief under § 1132(a)(3), because (for reasons discussed directly below) Plaintiff's Fiduciary Duty Claim is really a disguised benefits claim for which Plaintiff has an avenue for relief[41] pursuant to § 1132(a)(1)(B).[42] *See Wilkins*, 150 F.3d at 615 ("Because § 1132(a)(1)(B) provides a remedy for

---

[41] Notably, Plaintiff is properly treated as having an "avenue for relief" pursuant to § 1132(a)(1)(B)—which prevents Plaintiff's ability to recover under § 1132(a)(3)—even though Plaintiff is ultimately unsuccessful (as discussed in more detail below) in recovering pursuant to § 1132(a)(1)(B) due Plaintiff's failure to exhaust his administrative remedies. Plaintiff's available avenue for relief is through the administrative remedies of the Plan, and then after those remedies are exhausted, under § 1132(a)(1)(B). *See Hill v. Blue Cross & Blue Shield of Michigan*, 299 F. Supp. 2d 742, 750 (E.D. Mich. 2003) ("Plaintiffs, like the plaintiffs in *Wilkins* and *Marks*, may not pursue a breach-of-fiduciary-duty claim under § 1132(a)(3) because they have other avenues of relief available through the administrative remedies of the program and then, after those remedies are exhausted, under § 1132(a)(1)(B)." (citing *Marks*, 342 F.3d at 454; *Wilkins*, 150 F.3d at 616)), *aff'd in part, rev'd in part sub nom. Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710 (6th Cir. 2005).

A contrary decision (i.e., finding instead that a plaintiff does not have an "avenue for relief" pursuant to § 1132(a)(1)(B) if he has not yet exhausted his administrative remedies) strikes the Court as untenable. Such a decision would eviscerate the exhaustion requirement of § 1132(a)(1)(B) by allowing plaintiffs to evade it by forgoing available administrative remedies and instead running straight to § 1132(a)(3) as an avenue for relief under the theory that 1132(a)(1)(B) is not a viable "avenue for relief" since administrative exhaustion had not occurred.

[42] In his Response, Plaintiff, argues that although "Defendants may be correct that Plaintiff cannot recover under ERISA's catchall provisions if the Court determines he has stated valid claims under § 502(a)(1)(B)" that "at this stage of litigation Plaintiff is permitted to pursue multiple theories supported by his facts." (Doc. No. 52 at 15). However, if a plaintiff is to seek refuge in the principle that claims can be pleaded in the alternative, the claims must *actually* be pleaded in the alternative—i.e., pleaded so as to indicate that (and why) one claim applies *if and only if* another claim is rejected or noncognizable—which Plaintiff has not done here.

Moreover, the Sixth Circuit has expressly rejected this argument of Plaintiff's. *See Strang*, 693 F. App'x. at 405 ("[The plaintiff] also argues that the district court erred in dismissing its breach-of-fiduciary claim, as it should have been permitted as an alternative ground for relief. *Not so*." (emphasis added) (citing *Rochow*, 780 F.3d 364). In *Strang*, "the injury for the breach of fiduciary duty and for the denial of benefits [was] one in the same." *Id.* The Sixth Circuit went on to say that "where an avenue of relief for the injury was available under § 1132(a)(1)(B), '*irrespective of the degree of success obtained*,' a breach-of-fiduciary-duty claim cannot be brought," *id.* (quoting *Rochow*, 780 F.3d at 372 (emphasis added)), and that "[t]he only exception to this rule is . . . where the injury is different or it would not be adequately remedied under § 1132(a)(1)(B)." *Id.* As support for this conclusion, the court in *Strang* emphasized that "[i]n *Wilkins* the plaintiff was unsuccessful in seeking the denial-of-benefits remedy, but was still precluded from bringing the breach-of-fiduciary-duty claim." *Id.* Therefore, the Sixth Circuit has explicitly said that a plaintiff cannot plead a § 502(a)(1)(B) and a § 502(a)(3) claim alternatively, because the fact that § 502(a)(1)(B) provides an avenue for relief for the injury in question precludes plaintiff from bringing a breach of fiduciary duty claim under § 502(a)(3).

Importantly, the Court appreciates that the cases that Defendants cite were each at a later stage of litigation than is the instant case. *See Rochow*, 780 F.3d at 367 (summary judgment); *Varity Corp.*, 516 U.S.

---

[the plaintiff's] alleged injury that allows him to bring a lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)"). *Accord Rochow*, 780 F.3d at 372-73.

Via Plaintiff's Fiduciary Duty Claim, Plaintiff seeks to remedy the injury that Plaintiff allegedly suffered due to Defendants' Stock Repurchase (i.e., Plaintiff's Injury), which allegedly violated the terms of the Plan and resulted in Defendants transferring Plaintiff's (and the other putative class member's) ESOP account to the 401(k) Plan. (Doc. No. 43 at ¶ 163). To remedy Plaintiff's Injury via Count II, Plaintiff seeks "reactivation of his and the prospective class members' ESOP accounts" and the "restoration of these accounts to the full funding" that he believes he is entitled to receive. (*Id.* at ¶ 171). As Defendants correctly point out, "ERISA section 502(a)(1)(B) provides [Plaintiff] an avenue to do precisely that: seek benefits he believes he is entitled to receive," (Doc. No. 49 at 14), and "to enforce his rights under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B).

Via Plaintiff's Fiduciary Duty Claim, Plaintiff asserts not only that his injury (i.e., Plaintiff's Injury) was caused by Defendants wrongfully "violat[ing] express provisions of the [Plan]" (Doc. No. 43 at ¶ 163), but also that his (i.e., Plaintiff's) Injury was caused by: (1) Defendants violating express terms of ERISA, (*id.* at ¶ 162), and (2) Defendants committing

---

at 491 (trial); *Wilkins*, 150 F.3d at 611 (summary judgment). Nonetheless, there are other cases where courts have—at the motion-to-dismiss phase—dismissed Section 502(a)(3) claims where Section 502(a)(1)(B) provided an avenue for relief. *See e.g. Graddy v. BlueCross BlueShield of Tennessee, Inc.*, No. 4:09-CV-84, 2010 WL 11636233, at *4 (E.D. Tenn. July 2, 2010) (dismissing the Plaintiff's Section 502(a)(3) claim at the motion-to-dismiss phase "because Section 502(a)(1)(B) provides an adequate remedy for Plaintiff[.]"); *Canada v. Am. Airlines, Inc. Pilot Ret. Benefit Program*, No. 3:09-0127, 2009 WL 2176983, at *8 (M.D. Tenn. July 21, 2009) (dismissing a breach of fiduciary duty claim at the motion-to-dismiss phase as being duplicative of the plaintiff's denial of benefits claim); *Reynolds*, 2025 WL 582547, at *1 and 5 (same).

multiple breaches of their fiduciary duties, (*id.* at ¶ 161). The Court will address each assertion in turn.

First, Plaintiff asserts that "Plaintiff's claims are all statutory breach claims, as opposed to denial of benefits claims." (Doc. No. 52 at 16). However, Plaintiff's assertion is unavailing. As Plaintiff correctly pointed out in his Response, "[T]he relevant inquiry is what forms the basis of [Plaintiff's] right to relief: the contractual terms of the pension plan or the provisions of ERISA and its regulations." (Doc. No. 52 at 16 (quoting *Hitchcock*, 851 F.3d at 565 (internal quotation omitted))). Importantly—and as the Court explains above and below—the Court finds that each of Plaintiff's ERISA-based claims are without merit resulting in such claims being dismissed accordingly. Therefore, in reality, Plaintiff is relying solely on the terms of the Plan—which (according to Plaintiff) Defendants violated, thereby causing Plaintiff's Injury—as the basis of Plaintiff's Fiduciary Duty Claim. As Defendants correctly point out, "Plaintiff's claim is really one related to misinterpretation and misapplication of the Plan and that such has deprived him of benefits," and "[i]f [Plaintiff] wants the Plan interpreted differently, that is a task for the plan administrator under a claim for benefits." (Doc. No. 53 at 3).

Second, Plaintiff asserts that his injury (i.e., Plaintiff's Injury) was caused by Defendants (allegedly) committing multiple breaches of their fiduciary duties. (Doc. No. 43 at ¶161). But the Sixth Circuit has clarified that "ERISA remedies are concerned with the adequacy of relief to redress the claimant's injury, not the nature of the defendant's wrongdoing." *Rochow*, 780 F.3d at 371. This means that even if the Stock Repurchase (the event out of which Plaintiff's Injury allegedly arose) amounted to both (1) a wrongful denial of benefits owed (i.e., because the manner in which the Stock Repurchase was carried out was a violation of the terms of the Plan) and (2) a breach of fiduciary duty, ultimately because an avenue of relief for Plaintiff's Injury is available

under § 1132(a)(1)(B), Plaintiff is foreclosed from asserting a breach of fiduciary duty claim to attempt to remedy that same injury (i.e., Plaintiff's Injury). *See Rochow*, 780 F.3d at 372-73; *see also Strang*, 693 F. App'x. at 405-06.[43]

Notably, the Sixth Circuit has indicated that claimants can pursue relief under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) if the fiduciary duty claims are not merely "repackaged individual-benefits claims," but rather "claims for breach of fiduciary duty seek[ing] plan-wide injunctive relief, not individual-benefit payments." *Hill v. Blue Cross & Blue Shield*, 409 F.3d 710, 717-18 (6th Cir. 2005).[44] But Count II is not such a claim. In *Hill*, the plaintiffs filed a putative class lawsuit and were seeking both to recover benefits allegedly owed to the putative class under the terms of the plan and to enjoin Defendants to "alter the manner in which it administers all the Program's claims" *Id.* at 718. The court in *Hill* found that an award of benefits (that Defendant allegedly had improperly denied) would not provide complete relief to the plaintiffs, because they were also seeking injunctive relief. *Id.*

---

[43] Although Plaintiff is seeking via his Fiduciary Duty Claim also to disgorge Defendants' "individual gains" (Doc. No. 43 at ¶ 172) and to remove Defendants as fiduciaries (*id.* at ¶ 173), such requested relief would not qualify as a type of relief separate and distinct from the denial of benefits justifying recovery under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3). *See Rochow* 780 F.3d at 370 (clarifying that the desire to disgorge defendants in addition to recovering for denial of benefits does not allow plaintiff to pursue relief under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3), stating that "[a]llowing [the plaintiff] to recover disgorged profits under § 502(a)(3), in addition to his recovery under § 502(a)(1)(B), based on the claim that the wrongful denial of benefits also constituted a breach of fiduciary duty, would— absent a showing that the § 502(a)(1)(B) remedy is inadequate.").

[44] Tellingly, Plaintiff did not attempt to assert that the limited exception created in *Hill* would allow Plaintiff to pursue relief under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) in the present case. Instead, Plaintiff appears to concede that it would not appropriate for Plaintiff to ultimately prevail under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3). (*See* Doc. No. 52 at 15 ("Defendants may be correct that Plaintiff cannot recover under ERISA's catchall provisions if the Court determines he has stated valid claims under § 502(a)(1)(B), but at this stage of litigation Plaintiff is permitted to pursue multiple theories supported by his facts.")). But in any event, even if Plaintiff had invoked *Hill*, that would have been to no avail, for the reasons set forth above.

*Hill* is inapposite in the present case. Here, Plaintiff (on behalf of himself and the putative class) is seeking solely benefits he believes he (and the putative class) is owed under the terms of the Plan; Plaintiff does not claim that there is some plan-wide enforcement defect and, accordingly, does not seek the kind of class-wide injunctive relief like the plaintiff sought in *Hill*. Instead, Plaintiff alleges that the Stock Repurchase (which was a one-time stock repurchase that was carried out on December 31, 2021) was violative of the Plan and deprived Plaintiff (and the putative class members) of benefits they were owed: to remain participants in the Plan resulting in Plaintiff (and the putative class members) continuing to receive payouts based on participation in the Plan. Therefore, the limited exception presented in *Hill* does not apply to the case at bar, because an award of the benefits Plaintiff claims to be owed would provide complete relief.

Having determined that Plaintiff's Fiduciary Duty Claim is in substance a benefits claim disguised (whether consciously or unconsciously) as a breach-of-fiduciary duty claim, the Court next will assess whether Plaintiff was required to exhaust his administrative remedies before bringing this claim. As discussed above, Defendants argues that "[e]ven if Plaintiff had brought his claim as one seeking benefits, . . . he failed to exhaust administrative remedies as [the Sixth] Circuit requires," and that administrative exhaustion was required in this case (i.e., that failure to utilize administrative remedies was not excused). (Doc. No. 49 at 14-15). In response, Plaintiff argues that "even if the Court determines Plaintiff's claims do sound of [sic] benefit claims rather than statutory claims"—as in fact the Court has determined—that administrative exhaustion was not required[45] in this case because "Vollet's reaction to Plaintiff's protests demonstrates that any

---

[45] Notably, Plaintiff does not dispute that he failed to exhaust the remedies available under the Plan. (*See* Doc. No. 43 at ¶ 122 ("Accordingly, it would be futile for Plaintiff and members of the putative class to seek administrative remedies under the ESOP.")).

administrative appeal would have been futile and wasted resources." (Doc. No. 52 at 17). The Court disagrees.

As discussed above, the Sixth Circuit has "read an exhaustion requirement into the statute." *Hitchcock*, 851 F.3d at 560 (citation omitted). However, "[t]he administrative exhaustion requirement includes an exception for circumstances when resort to the administrative route is futile or the remedy inadequate." *Id.* at 560 (internal citations and quotations omitted). "In order to satisfy the high standard of futility, '[a] plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'" *Id.* (citing *Fallick*, 162 F.3d at 419 (citation omitted)). "ERISA regulations establish an additional exception[:] . . . In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant *shall be deemed to have exhausted the administrative remedies available under the plan* and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 887 (6th Cir. 2020) (internal citation and quotations omitted).

The Court finds that Plaintiff does not fall into either the futility exception nor the "failure to establish a claims procedure" exception. First, as it relates to the futility exception, Plaintiff argues that "Vollet's reaction to Plaintiff's protests demonstrates that any administrative appeal would have been futile and wasted resources." (Doc. No. 52 at 17). However, the Court finds that Plaintiff's Second Amended Complaint does not allege facts that plausibly suggest that an administrative appeal would have been futile. The Second Amended Complaint states (in relevant part) the following:

> 120. Further, the record here reflects that Plaintiff protested this course of action at every opportunity with Defendant Vollet, who had identified himself as

being authorized by Employer Entities and Individual Defendants to handle this illegal endeavor.

121. Vollet continually and consistently ignored Plaintiff's efforts to challenge this conduct.

122. Accordingly, it would be futile for Plaintiff and members of the putative class to seek administrative remedies under the ESOP.

(Doc. No. 43 at ¶¶ 120-22). Although these alleged facts (accepted as true) could potentially allow the Court to reasonably infer that Plaintiff had doubt that an appeal would result in a different decision, such an inference would not suffice to satisfy the applicable standard. *See Hitchcock*, 851 F.3d at 560 ("In order to satisfy the high standard of futility, '[a] plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.' (citing *Fallick*, 162 F.3d at 419 (citation omitted))). Instead, the facts alleged must suggest that it is certain that the claim will be denied. The Court finds that they do not.

Second, the Court finds that the "failure to establish a claims procedure" exception likewise does not excuse Plaintiff's failure to exhaust administrative remedies. Although Plaintiff asserted in his *Response* that "Defendants have not explained what administrative procedure was available and should have been followed," (Doc. No. 52 at 17), Plaintiff failed to make any such assertion (or factual allegation to support it) in his *Second Amended Complaint*, and the Plan does in fact provide for such procedure.[46] (*See* Doc. No. 1-2 at 42 ("Section 17.09 Denial Procedure and

---

[46] Although Plaintiff presumably could have attempted to argue that the claims procedure created by the Plan was not reasonable—which would trigger the "failure to establish a claims procedure" exception— Plaintiff did not do so, and the Court will not *sua sponte* raise that argument on Plaintiff's behalf. Therefore (for purposes of ruling on the Motion and in the absence of any argument to the contrary), the Court will assume that the claims procedure outlined in the Plan is reasonable.

Appeal Process")). Therefore, the Court finds that Plaintiff's failure to exhaust administrative remedies before filing suit is not excused under either exception.

In sum, the Court finds that the Fiduciary Duty Claim is a disguised benefits claim and that because an avenue of relief for Plaintiff's Injury is available under § 1132(a)(1)(B), Plaintiff is foreclosed from asserting a breach of fiduciary duty claim to attempt to remedy that same injury (i.e., Plaintiff's Injury). Further, even if Plaintiff had properly brought the claim pursuant to § 1132(a)(1)(B), the claim would be dismissed nonetheless because Plaintiff failed to exhaust administrative remedies before filing suit. Therefore, the Court will grant the Motion as it relates to Plaintiff's Fiduciary Duty Claim (Count II).

      C.     <u>ERISA Plan Document Penalty Claim, 29 U.S.C. § 1024(b)(4) (Count III)</u>

Plaintiff alleges that Defendants violated ERISA section 104(b)(4), 29 U.S.C. § 1024(b)(4),[47] by failing to provide him documents in response to his request for the "Plan document including all amendments and any documents regarding the reshuffling procedures" ("Document Claim"). (Doc. No. 43 at ¶ 74; *id.* at ¶ 181 (alleging Defendants "fail[ed] to furnish documents and information required under the ESOP and ERISA")).

In relevant part 29 U.S.C. § 1024(b)(4) states the following:

> **(4)** The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description[,] and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

---

[47] The Court will refer interchangeably to "29 U.S.C. § 1024" and "ERISA Section 104," which is the number of the section in the Employee Retirement Income Act of 1974 that was codified at 29 U.S.C. § 1024.

29 U.S.C. § 1024(b)(4). Further, 29 U.S.C. § 1132(c)(1)(A) clarifies that if an "administrator is required by this title to furnish to a participant or beneficiary" particular information, then the administrator of the plan must provide the requested information "within thirty days after such request" or else be subjected to the fines outlined in 29 U.S.C. § 1132(c)(1)(A).

In the present case, on December 17, 2021, Plaintiff's counsel sent a letter to Defendants wherein Plaintiff "demand[ed] a copy of the ESOP 'Plan document including all amendments and any documents regarding the reshuffling procedures'" ("Request for Documents"). (Doc. No. 43 at ¶ 74 ("On December 17, [Plaintiff's counsel], wrote to Vollet and David Lewis, reiterating that Plaintiff did not want to sell his ESOP stock and demanding a copy of the ESOP" and any amendments.). Plaintiff admits that eighteen days later, on January 4, 2022—which was within the thirty-day deadline imposed by 29 U.S.C. § 1332(c)(1)(A)—Plaintiff received certain Plan documents from Defendants. (Doc. No. 43 at ¶ 184). However, Plaintiff argues that there were other documents that Plaintiff was entitled to receive that Defendants withheld in violation of 29 U.S.C. § 1024(b)(4). However, for the reasons discussed below, the Court finds that Plaintiff did not adequately allege the existence of these hypothetical "other documents" in his Second Amended Complaint, thereby warranting dismissal of Plaintiff's Document Claim.

The Court discerns that Plaintiff's Document Claim rests on Plaintiff's theory that because (according to Plaintiff) "nothing in the ESOP Plan documents in Plaintiff's possession authorize or reflect" the course of action taken by Defendants (i.e., the Stock Repurchase) (Doc. No. 43 at ¶ 179), Defendants must have made an amendment to the Plan—one that did authorize Defendants to conduct the Stock Repurchase—that Defendants have withheld from Plaintiff in violation of 29 U.S.C. § 1024(b)(4). (Doc. No. 43 at ¶ 178 ("Plaintiff has never received any amendment to the ESOP that aligns with Defendant Vollet's initial communication" regarding the stock repurchase);

*id.* at ¶ 183 ("Defendants have not produced ESOP Plan documents, or any documents at all, to Plaintiff that correlate to the course of conduct Vollet states the Holding Company's Board of Directors had approved in any of his communications."); Doc. No. 52 at 22 ("Defendants have indicated an amendment to the [Plan] was made that to date has not been provided to Plaintiff")).

Notably, *if* (as Plaintiff contends) such an amendment to the Plan existed, then Plaintiff would be entitled to a copy of such amendment pursuant to 29 U.S.C. § 1024(b)(4). However, the Court finds that Plaintiff has not alleged factual matter plausibly suggesting that such an amendment exists. The parties dispute whether the Plan as drafted permitted the Stock Repurchase. (*Compare* Doc. No. 43 at ¶ 183 ("Defendants have not produced ESOP Plan documents, or any documents at all, to Plaintiff that correlate to the course of conduct Vollet states the Holding Company's Board of Directors had approved in any of his communications."), *with* Doc. No. 49 at 28 ("the Plan document expressly allows for the conversion of the ESOP accounts held by Inactive Participants to cash to be reinvested")). As discussed above, Plaintiff contends that nothing in the Plan authorized Defendants to carry out the Stock Repurchase and that this must mean that Defendants are withholding an amendment to the Plan that did authorize the Stock Repurchase.[48] (Doc. No. 43 at ¶¶ 178-79). But even assuming *arguendo* that the Plan did not authorize Defendants to conduct the Stock Repurchase, the Court cannot thereby infer that the Plan was amended as Plaintiff asserts; this is because although it is possible that an amendment was made to the Plan, it strikes the Court as at least equally possible that Defendants carried out the

---

[48] Notably, and as discussed above (*Supra* Section 2.A), Plaintiff—in both his Second Amended Complaint and Response—argued that the Stock Repurchase violated the terms of the Plan. But via the Document Claim, Plaintiff appears to try to assert alternatively that because the Stock Repurchase was violative of the Plan, there must have been an amendment to the Plan that Defendants are withholding from Plaintiff. Notably, the two aforementioned assertions are inconsistent with one another, and although Plaintiff did not himself identify the Document Claim as an alternative claim or make plain why it is cognizable and permissible as an alternative claim, the Court will assume *arguendo* that that the Document Claim was properly pled in the alternative.

Stock Repurchase *without* an amendment to the Plan (either because they believed that the Stock Repurchase was not in violation of the Plan or because Defendants chose to carry out the Stock Repurchase irrespective of whether it was in violation of the Plan).

Nothing in the Second Amended Complaint helps the Court ascertain which of these two versions of events is accurate, and so the Court would have to indulge in mere guesswork and speculation to infer that the Plan was amended as Plaintiff suggests, as this means that the Court cannot find this inference *plausible* as *Iqbal* and *Twombly* require. *See Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 112 (2d Cir. 2010) ("A claim based on such speculation is implausible." (citing *Iqbal*, 129 S. Ct. at 1949)); *Downing v. Ford Motor Co.*, No. 17-10652, 2018 WL 3301210, at *6 (E.D. Mich. Feb. 5, 2018) ("[T]his is the type of speculation that is insufficient under *Twombley* and *Iqbal* to push a claim over the line from speculation to plausibility."), *report and recommendation adopted*, No. 17-CV-10652, 2018 WL 1417599 (E.D. Mich. Mar. 22, 2018), *aff'd,* No. 18-1335, 2018 WL 4621955 (6th Cir. Sept. 24, 2018). Without more in the Second Amended Complaint, the Court cannot and does not find that Plaintiff has alleged facts plausibly suggesting the existence of an amendment.

In sum, the Court finds that Plaintiff has not alleged factual matter plausibly suggesting that Defendants withheld any documents from Plaintiff that Plaintiff was entitled to receive pursuant to 29 U.S.C. § 1024(b)(4). Therefore, the Court will grant the Motion as it relates to Plaintiff's Document Claim (Count III).

Defendants argue that Count IV should be dismissed because Plaintiff "does not allege that Defendants interfered with Plaintiff's benefits but rather alleges that they gave him his benefits." (Doc. No. 49 at 23). In response, Plaintiff asserts that he has sufficiently pled Count IV, asserting that "Defendants discriminated,[50] and Plaintiff and the putative class of Inactive Participants had their ESOP accounts closed despite this [closure]'s plain contradiction [of] the ESOP Plan language throughout Article XI." (Doc. No. 52 at 24). Notably, Count IV is premised on the assertion that the manner in which Plaintiff's ESOP account was closed (i.e., via the Stock Repurchase) was violative of the terms of the Plan. (*See* Doc. No. 43 at ¶ 196 ("In short, Employer Entities and Individual Defendants s [sic] have at every turn acted in accordance with their own, conflicted interests and financial incentives *rather than in accordance with the terms of the ESOP* and the requirements of ERISA." (emphasis added)); *id.* at ¶ 197 ("These actions, individually and collectively, constitute interference with Plaintiff's protected rights under ERISA, preventing him from receiving the benefits to which he is entitled under the ESOP."); Doc. No. 52 at 23 ("Article XI of the ESOP prohibits distributions and rollovers without consent and/or a written election by the participants. . . . Defendants closed Plaintiff's ESOP and made a distribution via rollover to the 401(k) despite the fact Plaintiff did not consent or elect in writing to this rollover or the closure of his account. . . . Here, Defendants plainly did not follow the formal procedures of the ESOP when

---

[49] The Court uses this caption because Count IV portrays itself as an Interference Claim. As discussed below, however, the Court finds this portrayal inaccurate.

[50] In his Response, Plaintiff argues that "Defendants discriminated against Inactive Participants by amending the [Plan] to curtail their participation in the [Plan]." (Doc. No. 52 at 24). As far as the Court can tell, Plaintiff is alleging that Defendants discriminated on the basis of whether Plan participants were active or inactive.

they unilaterally closed Plaintiff's ESOP account and distributed the liquidated funds without his consent or election.")).

29 U.S.C. § 1140 (ERISA § 510)[51] provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 USCS § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. The aforementioned provision "offers protection against two types of conduct: adverse action taken because a participant availed himself of an ERISA right (an 'exercise' or 'retaliation' violation), and interference with the attainment of a right under ERISA (an 'interference' violation)." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 506 (6th Cir. 2004) (citation omitted). In the present case, Plaintiff asserts only an "interference violation" ("Interference Claim") and not a "retaliation violation." (Doc. No. 43 at ¶ 188 ("Employer Entities and Individual Defendants have discriminated against Plaintiff and the putative class members for the purpose of interfering with their attainment of their rights under the ESOP and ERISA.")). Therefore, the Court will conduct only an "interference violation" analysis and will forgo conducting a "retaliation violation" analysis.

"In relevant part, § 510 of ERISA makes it unlawful to 'discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which [he] may become entitled under [an employee benefit] plan.'" *Spangler v. E. Ky. Power Coop., Inc.*, 790 F. App'x. 719, 721 (6th Cir. 2019) (quoting 29 U.S.C. §

---

[51] The Court will refer interchangeably to 29 U.S.C. § 1140" and "ERISA Section 510," which is the number of the section in the Employee Retirement Income Act of 1974 that was codified at 29 U.S.C. § 1140.

1140). "To establish a[n interference] violation of Section 510 of ERISA, an employee must show 'the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Hrdlicka v. GM, LLC*, 59 F.4th 791, 809 (6th Cir. 2023) (quoting *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)). Notably, "[t]he circuits are split on whether a plaintiff must exhaust plan remedies before bringing a § 510 claim for interference with a right to benefits," and the Sixth Circuit previously "declined to address this question when it was unnecessary to do so." *Hardy v. BellSouth Telecomms., Inc.*, No. 3:04-CV-172-H, 2005 WL 8175148, at *1 n.2 (W.D. Ky. Aug. 19, 2005) (citing *Hill*, 409 F.3d 710). Nonetheless, "the Sixth Circuit has held that an employee may not style a denial of benefits claim as some other type of ERISA claim simply to avail herself of a more desirable remedy or to avoid the exhaustion requirement." *Id.* (citing *Wilkins*, 150 F.3d 609; *Weiner*, 108 F.3d 86).

In the present case, although Plaintiff frames Count IV as an Interference Claim, the Court finds that Count IV is actually a disguised ERISA § 502(a)(1)(B) denial-of-benefits claim. The Court so finds because the allegations underlying Count IV tends less towards plausibly suggesting all elements of an Interference Claim and more towards plausibly suggesting that Plaintiff was denied benefits to which he allegedly was entitled.

The first element of an Interference Claim is that the defendant engaged in prohibited conduct—such as "discharge[ing], fin[ing], suspend[ing], expel[ling], discipline[ing], or discriminat[ing] against a participant or beneficiary[.]" 29 U.S.C. § 1140. In the present case, Plaintiff does not allege that Defendants engaged in any of the aforementioned conduct or even comparable conduct. Instead, the Court discerns that in support of Count IV, Plaintiff is asserting that the prohibited conduct in which Defendants allegedly engaged was the alleged violation of the terms of the Plan when carrying out the Stock Repurchase—conduct that resulted in the denial

of benefits that Plaintiff contends he was owed.[52] This kind of conduct may be grounds for a denial-of-benefits claim, but it is not grounds for an Interference Claim. *See Thomas v. Amazon.com Servs.*, No. 4:21-CV-02997, 2025 U.S. Dist. LEXIS 191320, at *25 (S.D. Tex. Sep. 28, 2025) ("To violate Section 1140, the employer must take an adverse employment action—such as discharging, fining, suspending, expelling, disciplining, or discriminating against the employee—with the intent to interfere with the attainment of ERISA benefits. 29 U.S.C. § 1140. A mere denial of benefits does not suffice.") (citing *Hogan v. Jacobson*, 823 F.3d 872, 885 (6th Cir. 2016))); *id.* ("Section 1140 isn't a substitute for a benefits claim under Section 502(a)(1)(B)."); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 422 (4th Cir. 1993) ("A plaintiff must, however, show more than the mere denial of a claim to establish that an insurer has acted with the intent of interfering with a future right under 29 U.S.C. § 1140.").

All of this suggests that the thrust of Count IV is not to recover for interference with the "attainment of any right to which such participant may become entitled under the plan," 29 U.S.C. § 1140, but rather to recover "[under] ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), [on] a contract-based cause of action [available] to participants and beneficiaries to recover benefits, enforce rights, or clarify rights to future benefits under the terms of an employee benefit plan."

---

[52] The Court discerns this from various statements made respectively in either the Second Amended Complaint or in Plaintiff's briefing. (*See* Doc. No. 43 at ¶ 196 ("In short, Employer Entities and Individual Defendants s [sic] have at every turn acted in accordance with their own, conflicted interests and financial incentives *rather than in accordance with the terms of the ESOP* and the requirements of ERISA." (emphasis added)); *id.* at ¶ 197 ("These actions, individually and collectively, constitute interference with Plaintiff's protected rights under ERISA, preventing him from receiving the benefits to which he is entitled under the ESOP."); Doc. No. 52 at 23 ("Article XI of the ESOP prohibits distributions and rollovers without consent and/or a written election by the participants. . . . Defendants closed Plaintiff's ESOP and made a distribution via rollover to the 401(k) despite the fact Plaintiff did not consent or elect in writing to this rollover or the closure of his account. . . . Here, Defendants plainly did not follow the formal procedures of the ESOP when they unilaterally closed Plaintiff's ESOP account and distributed the liquidated funds without his consent or election."); *id.* at 24 ("Defendants discriminated, and Plaintiff and the putative class of Inactive Participants had their ESOP accounts closed despite this act's plain contradiction to the ESOP Plan language throughout Article XI.")).

*Hitchcock*, 851 F.3d at 560 (quoting *Fallick*, 162 F.3d at 418). That is, Count IV is in substance a denial-of-benefits claim that is disguised (whether consciously or unconsciously) as an Interference Claim.

There is an incentive for a plaintiff to takes this approach. As with the above-discussed incentive for a plaintiff to disguise a denial-of-benefits claim as a breach-of-fiduciary-duty claim, the incentive here is the potential avoidance of the administrative-exhaustion requirement that applies to denial-of-benefits claims.

Although the Sixth Circuit has not addressed specifically whether administrative exhaustion is required before pursuing an Interference Claim, the caselaw is clear that "an employee may not style a denial of benefits claim as some other type of ERISA claim simply to avail [himself] of a more desirable remedy or to avoid the exhaustion requirement," *Hardy*, 2005 WL 8175148, at *1 n.2 (citing *Wilkins*, 150 F.3d 609). *See id.* ("Defendant argues that Plaintiff's claim for severance pay is not really a § 510 interference claim, but an ordinary denial of benefits claim which does require exhaustion. Indeed, the Sixth Circuit has held that an employee may not style a denial of benefits claim as some other type of ERISA claim simply to avail herself of a more desirable remedy or to avoid the exhaustion requirement." (citing *Wilkins*, 150 F.3d 609)).

But ultimately, whatever Plaintiff's reason or motive, the Court finds that Count IV is really a denial-of-benefits claim and therefore is subject to the administrative exhaustion requirement even though Count IV is portrayed as an Interference Claim. And so the Court treats it as such.

This conclusion is further supported by the fact that "ERISA § 510's prohibition against interfering with employee benefits is enforced through the provisions of ERISA § 502. 29 U.S.C. § 1140." *Alexander v. Bosch Auto. Sys., Inc.*, 232 F. App'x 491, 496 (6th Cir. 2007). More specifically, this Court has clarified that violations of ERISA Section 510 Section are "exclusively

enforced through ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)." *Coutu v. Bridgestone Americas, Inc.*, No. 3:17-CV-01492, 2019 WL 6492899, at *2 (M.D. Tenn. Dec. 3, 2019) (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 145 (1990) (finding Section 502(a) is the "exclusive remedy for vindicating § 510-protected rights"); *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247 (10th Cir. 2004) ("Section 502(a)(3) of ERISA provides the plan participant with his exclusive remedies for a § 510 violation.")). This point is of relevance because, as noted above (*supra* Section II.B), the Sixth Circuit has clarified that "the availability of relief under § 502(a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § 502(a)(1)(B)." *Rochow*, 780 F.3d at 372-73 (citing *Wilkins*, 150 F.3d at 615).

Importantly, the remedy Plaintiff seeks via Count IV is the same remedy sought via the Fiduciary Duty Claim: "reactivation of his and the prospective class members' ESOP accounts" and the "restoration of these accounts to the full funding" that he believes he is entitled to receive. (Doc. No. 43 at ¶¶ 171 and 198). But as discussed above (*supra* Section II.B) Plaintiff could avail himself of a remedy pursuant to § 502(a)(1)(B)—which empowers plaintiffs to "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"—to obtain the relief sought, meaning Plaintiff is unable to recover pursuant to § 502(a)(3).

In sum, the Court finds that Count IV is a disguised benefits claim as opposed to a claim under § 1140, which fails for the same reasons as discussed above (*supra* Section II.B). Therefore, the Court will grant the Motion as it relates to Count IV.

### E. ERISA Equitable and Injunctive Relief Claim (Count V)

Via Count V Plaintiff again tries to recover under 29 U.S.C. § 1132(a)(3) for equitable and injunctive relief. (Doc. No. 43 at pp. 29-30). Defendants argue that Count V should be dismissed because "'equitable relief' is not an independent cause of action [but rather] a type of relief designed to remedy an underlying violation." (Doc. No. 49 at 24). The Court agrees. Count V fails because it is a mere request for relief, and not a cause of action that (if valid) could support relief; a mere request for relief (unlike a validly pleaded cause of action) does not plausibly suggest an entitlement to relief as required by *Iqbal* and *Twombly*. Therefore, the Court will grant the Motion as it relates to Plaintiff's Claim for equitable and injunctive relief (Count V).

### F. State Law Claims (Counts VI and VII)

Plaintiff brought two state law claims in the alternative—(1) breach of ESOP contract, and (2) unjust enrichment. (Doc. No. 43 at pp. 30-32). The Sixth Circuit has held that "[g]enerally, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (internal citations and quotations omitted). *Accord Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997) ("the district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction" (internal citations and quotations omitted)).

In the present case, the Court has dismissed Plaintiff's ERISA claims, which provided the sole basis of original jurisdiction in this case (i.e., federal-question jurisdiction under 28 U.S.C. § 1331).[53] The Court therefore declines to exercise supplemental jurisdiction over the state-law claims against Defendants. The claims therefore will be dismissed without prejudice to being filed

---

[53] Plaintiff did not allege that this Court has diversity jurisdiction under 28 U.S.C. § 1332.

in an appropriate state court. But the Court wishes to point out that—contrary to Defendants' assertion that "Plaintiff's state law claims *must* be dismissed," (Doc. No. 53 at 5 (emphasis added))—the Court is not required to dismiss Plaintiff's state law claims even though the Court dismissed Plaintiff's federal claims. Instead, such simply *permits* the Court to dismiss the state law claims but does not require such. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction."). Nonetheless, the Court does—in its discretion—find it appropriate to dismiss the state law claims.

Therefore, the Court will dismiss Plaintiff's state law claims (Counts VI and VII) without prejudice.

<u>CONCLUSION</u>

For the reasons indicated herein, the Court will **GRANT in part and DENY in part** Defendants' Motion to dismiss (Doc. No. 48). The Court will **DENY** the Motion to the extent that it asks the Court to dismiss for lack of standing, but will **GRANT** the Motion to the extent that it asks the Court to dismiss Plaintiff's claims (Counts I-VII) on the merits.

An appropriate corresponding order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE